**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| BRET A. BROADDUS, | ) | |
| | ) | No. 08-CV-04420 |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | Judge St. Eve |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| KEVIN SHIELDS, | ) | |
| | ) | Jury Demanded |
| Defendant/Counter-Plaintiff. | ) | |

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES & COUNTER-CLAIM

Defendant Kevin Shields ("**Defendant**"), by his attorneys Thomas I. Matyas and Alison C. Conlon of Wildman, Harrold, Allen & Dixon LLP, answers Plaintiff's Complaint and asserts the following Affirmative Defenses and Counter-Claims against Plaintiff Bret A. Broaddus ("**Plaintiff**").

## I.    ANSWER

Pursuant to Fed. R. Civ. P. 8, Local Rule 10.1 and all other applicable rules, Defendant Shields answers the Complaint as follows:

1.    On or about April 13, 1999, Will Partners, LLC ("**Will Partners**") was incorporated in Illinois by Defendant Kevin Shields and Don Pescara, among others.

**ANSWER:**  Denied.

2.    On information and belief, Will Partners was an entity which purchased real property for leasing and development.

**ANSWER:**  The First Amended and Restated Limited Liability Company Agreement of Will Partners (the "**LLC Agreement**") speaks for itself and describes the business operations of

Will Partners and Defendant denies any allegations inconsistent with the LLC Agreement and denies any other allegations in paragraph 2.

3.     On or about November 2, 2000, Broaddus was assigned a 10% membership interest in Will Partners, and Will Partners further agreed to provide Broaddus with compensation for services Broaddus provided to Will Partners in an amount equal to 44.444% of 90% of "the Net Cash Flow, Net Proceeds, or in kind distributions received by Shields and Pescara" in connection to their proportionate membership interests.  See November 2, 2000 Agreement attached hereto and marked as Exhibit A.  The November 2, 2000 Agreement acknowledges that Broaddus was to receive a 50% share of the distributions of Will Partners.

**ANSWER:**  Without waiving the release of the November 2, 2000 Agreement by the two (2) written Assignments, dated March 31, 2003, executed by Plaintiff, Defendant answers that the November 2, 2000 Agreement speaks for itself and therefore Defendant denies all allegations inconsistent with that instrument and denies all other allegations contained in paragraph 3.

4.     The services Broaddus provided to Will Partners was in connection to the acquisition and construction of several build-to-suit buildings purchased by Will Partners. Broaddus negotiated the acquisition and/or construction of these build-to-suit properties and procured commercial tenants for the properties on behalf of Will Partners.

**ANSWER:**  Denied.

5.     On or about November 1, 2001, Broaddus was involved in a motor vehicle accident in which he suffered massive bodily injury and a traumatic brain injury.  Thereafter, Broaddus lost significant mental faculty and has since struggled with regaining his cognitive abilities.

**ANSWER:**  Defendant lacks sufficient knowledge or information with which to form a belief as to the truth or falsity of the allegation that on or about November 1, 2001, Plaintiff was involved in a motor vehicle accident in which he suffered massive bodily injury and a traumatic brain injury.  Furthermore, Defendant does not have sufficient knowledge or information with which to form a belief as to the truth or falsity of the allegation that Plaintiff lost significant mental faculty as a result of the alleged November 1, 2001 motor vehicle accident.  Defendant denies that Plaintiff has struggled with regaining his cognitive abilities and denies the remaining allegations in paragraph 5.

6.     Subsequent to Broaddus' motor vehicle accident of November 2001, Shields made certain misrepresentations about partnership assets and liabilities to Broaddus; namely, that rents were not being received for several of the build-to-suit properties and otherwise underrepresented accounts receivable to Broaddus.

**ANSWER:**  Denied.

7.     By making such statements in connection to the accounts receivable of Will Partners, Shields persuaded Broaddus to assign Broaddus' shares in Will Partners to Shields.  On or about June 1, 2003, Broaddus assigned all right, title, and interest in Will Partners to Shields in exchange for compensation far below the actual value of compensation (3 cents for every dollar owed) due and owing to Broaddus pursuant to the November 2, 2000 Agreement.  See June 1, 2003 Assignments, attached hereto and marked as Exhibits B and C respectively.

**ANSWER:**  Denied.

## COUNT I

### (Breach of Fiduciary Duty)

8.     Plaintiff restates and realleges paragraphs 1 through 7 as though fully restated as paragraph 8 of this Count I.

**ANSWER:**  Defendant restates and realleges his answers to paragraphs 1 through 7 as though fully restated as his answer to paragraph 8 of this Count I.

9.     A special relationship existed between Shields and Broaddus because they were fellow members of Will Partners.

**ANSWER:**  Without waiving the release of the November 2, 2000 Agreement by the two (2) written Assignments, dated March 31, 2003, executed by Broaddus, Defendant answers that the operative agreements that establish the alleged relationship of Plaintiff and Defendant to each other and to Will Partners speak for themselves and therefore any allegations inconsistent with such agreements are denied and the remaining allegations of paragraph 9 constitute legal conclusions that do not require an answer, but to the extent an answer is required, the same are denied.

10.     Shields, who maintained, controlled and managed the assets and liabilities of Will Partners owed Broaddus a fiduciary duty in the management of Will Partners and owed Broaddus a duty to accurately and truthfully account to the members about the business and financial affairs of Will Partners.

**ANSWER:**  The LLC Agreement sets for the rights and responsibilities related to Will Partners and therefore any allegations inconsistent with such instrument is denied and the remaining allegations of paragraph 10 constitute legal conclusions which do not require an answer, but to the extent an answer is required, the same are denied.

11.     Shields breached his duty to Broaddus by making [*sic.*] exerting undue influence on Broaddus and taking advantage of Broaddus while he was in a weakened condition and by making misrepresentations to Broaddus with respect to the assets and liabilities of Will Partners in order to induce Broaddus to sell, at a highly reduced rate, Broaddus' interest in Will Partners.

**ANSWER:**  Denied.

12.     As a result of Shields' misrepresentations made to Broaddus, Broaddus was convinced by Shields to sell his interests in Will Partners for an amount worth far less than the actual amount due to Broaddus for his efforts expended on behalf of Will Partners.

**ANSWER:**  Denied.

13.     As a direct and proximate result of Shields' breaches of fiduciary duties, Plaintiff has suffered damages in the amount to be proven at trial, but in excess of $75,000.00, including all compensatory damages and costs.

**ANSWER:**  Denied.

WHEREFORE, Defendant Kevin Shields respectfully requests that this Court enter judgment in his favor and against Plaintiff, award his costs, and award any further relief deemed just.

## AFFIRMATIVE DEFENSES

Without assuming any burden he would not otherwise bear, and pursuant to Fed. R. Civ. P. 8 and all other applicable rules, Defendant Shields asserts the following Affirmative Defenses:

1.     On or about March 31, 2003 Plaintiff made two (2) written Assignments dated March 31, 2003, (the "**True 2003 Assignments**") which are attached hereto as **Exhibits 1 and 2** and at the same time received the $600,000.00 payment as consideration.

2.     Plaintiff's claim is barred in whole or in part by the statute of limitations since the alleged acts and omissions must be claimed to have occurred prior to March 31, 2003, the date of the True 2003 Assignments, which is more than 5 years prior to the filing of this lawsuit. 735 ILCS 5/13-205.

3.     Plaintiff's claim is barred by the doctrines of waiver, estoppel, unclean hands and laches.

4.     The True 2003 Assignments contained a general release of Defendant and otherwise bars all claims asserted in this lawsuits, including by reason of the written Representation and Warranties of the "Assignor," the Plaintiff herein, on pages 1 and 2 of the True 2003 Assignments.

## II.     **COUNTER-CLAIMS**

Counter-Plaintiff Shields (hereinafter "**Counter-Plaintiff**") asserts the following Counter-Claim against Counter-Defendant Broaddus (hereinafter "**Counter-Defendant**") in accordance with Fed. R. Civ. P. 13 and all other applicable rules:

### COUNT I

1.     Counter-Defendant made, executed and delivered to Counter-Plaintiff on or about March 31, 2003 two (2) written assignments dated March 31, 2003 and at the same time, Counter-Defendant received from Counter-Plaintiff $500,000.00 pursuant to one of the assignments and an additional $100,000.00 pursuant to the second assignment (the "**True 2003 Assignments**") which are attached here as **Exhibits 1 and 2**.

2.      Counter-Defendant made certain Representation and Warranties in each of the True 2003 Assignments and such Representations and Warranties include but are not limited to the following:

> (e)  Assignor has had an opportunity to ask questions and receive answers regarding the terms and conditions of the sale of the Membership Interest and has had full access to such other information concerning the Company as he has requested, including an opportunity to examine the books and records of the Company and to discuss the condition of the Company; (f) Assignor has waived all rights of appraisal of the value of the Company and any other method of determining the value of the Membership Interest; (g) the Purchase Price constitutes fair and sufficient consideration for the sale of the Membership Interest; and (h) Assignor has been advised to seek the advice of independent counsel with respect to the transactions contemplated by this Assignment.

3.      The Counter-Defendant provided to Counter-Plaintiff a General Release in the True 2003 Assignments.

4.      The True 2003 Assignments contain identical indemnification clauses that provide:

> **Indemnification.**     Assignor  [Counter-Defendant]  agrees  to indemnify,  defend  and  hold  harmless  the  Assignee  [Count-Plaintiff]  and  its  agents,  shareholders,  members,  managers,

directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignor contained herein. Assignee agrees to indemnify, defend and hold harmless the Assignor and its agents, shareholders, members, managers, directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignee contained herein. These indemnifications shall survive the date of this Assignment.

True 2003 Assignments (**Exhibits 1 and 2**).

5.     This lawsuit represents a breach of the Representations and Warranties contained in the True 2003 Assignments.

6.     This lawsuit represents a breach of the General Release contained in the True 2003 Assignments.

7.     Counter-Plaintiff has and will incur losses out of or due to the breach of the representations, warranties and covenants of Counter-Defendant, certainly attorneys fees and potentially other damages in relation to Counter-Plaintiff's real estate business where lenders may decline loans due to the claims in this lawsuit although such claims are without factual or legal basis.

WHEREFORE, Counter-Plaintiff Shields respectfully requests that this Court enter judgment in his favor and against Counter-Defendant Broaddus in the amount of damages to be determined at trial, including Counter-Plaintiff Shields' attorneys fees and litigation costs and expenses, and award any other relief deemed just.

### COUNT II

1.      The First Amended and Restated Limited Liability Company Agreement (the "**LLC Agreement**") of Will Partners provides among other matters the following in Section 13.12:

> **Attorneys Fees.**  In any action or proceeding between and among the Members arising out of this Agreement, the unsuccessful Member shall pay to the prevailing Member all costs and expenses, including, without limitation, reasonable attorneys fees incurred by the prevailing Member in such action or proceeding whether or not such action or proceeding is prosecuted to judgment.

A true and correct copy of the LLC Agreement is attached hereto as **Exhibit 3**.

2.      The Counter-Defendant has asserted  herein that he was a "member" of Will Partners and therefore without prejudice to any and all defenses, positions and claims of the Counter-Plaintiff on that claim and pleading in the alternative, the Counter-Plaintiff asserts that in the event Counter-Plaintiff is the prevailing party in this lawsuit, which he should be, then in such event and if the Counter-Defendant is adjudicated to have been a member of Will Partners, all reasonable attorneys fees incurred by the Counter-Plaintiff in connection with the claims of the Counter-Defendant in his Complaint and the claims of the Counter-Plaintiff in this Counter-Claim are the obligations of the Counter-Defendant and should be paid to the Counter-Plaintiff.

3.      Counter-Plaintiff has incurred and expects to incur attorneys fees in connection with this lawsuit.

WHEREFORE, Counter-Plaintiff Shields respectfully requests that this Court enter judgment in his favor and against Counter-Defendant Broaddus in the amount of damages to be determined at trial, including Counter-Plaintiff Shields' attorneys fees and litigation costs and expenses, and award any other relief deemed just.

## COUNT III

1.      Pleading in the alternative and without prejudice to the General Release in the True 2003 Assignments, Counter-Plaintiff alleges that Counter-Plaintiff and Counter-Defendant were parties to a written Agreement, dated November 2, 2000 and a true and correct copy is attached hereto as **Exhibit 4**.

2.      Paragraph 7 of the November 2, 2000 Agreement includes a prevailing party fee shifting provision.

3.      In the event Counter-Plaintiff is the prevailing party in this lawsuit, which he should be, then in such event and if the November 2, 2000 Agreement is not adjudicated to have been released, all reasonable attorneys fees incurred by the Counter-Plaintiff in connection with the claims of the Counter-Defendant in his Complaint and the claims of the Counter-Plaintiff in this Counter-Claim are the obligation of the Counter-Defendant and should be paid to the Counter-Plaintiff.

4.      Counter-Plaintiff has incurred and expects to incur attorneys fees in connection with this lawsuit.

WHEREFORE, Counter-Plaintiff Shields respectfully requests that this Court enter judgment in his favor and against Counter-Defendant Broaddus in the amount of damages to be determined at trial, including Counter-Plaintiff Shields' attorneys fees and litigation costs and expenses, and award any other relief deemed just.

**III.    <u>JURY DEMAND</u>**

Defendant/Counter-Plaintiff requests trial by jury.

Dated:  August 12, 2008                           Respectfully submitted,


                                                  s/ Thomas I. Matyas
                                                  One of the Attorneys for Kevin Shields

Thomas I. Matyas (1796984)
Alison C. Conlon (6272083)
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive, 30th Floor
Chicago, Illinois 60606
312-201-2000 (telephone)
312-201-2555 (fax)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 12, 2008, a true and correct copy of the foregoing **Defendant's Answer, Affirmative Defenses and Counter-claim,** were electronically filed with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

Ariel Weissberg
Rakesh Khanna
Weissberg and Associates, Ltd.
401 S. LaSalle Street, Suite 403
Chicago, IL  60605

                        s/ Thomas I. Matyas
                      Attorney for Kevin Shields

Thomas I. Matyas (1796984)
Alison C. Conlon (6272083)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois  60606-1229
Phone:  (312) 201-2000
Fax:     (312) 201-2555

# EXHIBIT 1

## ASSIGNMENT

**THIS ASSIGNMENT** is executed as of the 31st day of March, 2003 by Bret A. Broaddus, an Illinois resident ("Assignor") in favor of Kevin A. Shields ("Assignee").

**THIS ASSIGNMENT** is made with reference to the following facts:

A.    Assignor is the holder of that certain agreement executed by and between Kevin A. Shields ("Shields"), Don G. Pescara ("Pescara") and Bret A. Broaddus ("Broaddus") and dated November 2nd, 2000 wherein Shields and Pescara assigned to Broaddus a portion of their membership interests in Will Partners, LLC, a Delaware limited liability company (the "Company") such that, following the assignment, Broaddus, among other things, is entitled to effectively receive 50.0% of 100.0% of the distributions to all members of the Company (the "Membership Participation").

B.    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor desires to execute and deliver this Assignment for the purpose of assigning the Membership Participation to Assignee.

**NOW, THEREFORE**, in consideration of the foregoing and intending to be legally bound hereby, Assignor agrees as follows:

**TO HAVE AND TO HOLD,** Assignor does hereby assign, transfer, convey and deliver to Assignee, its successors and assigns, all rights, interests, and titles of Assignor in and to the Membership Participation for Assignee's use and benefit forever, with full power and authority vested in Assignee with respect to the Agreement, to demand, receive and to sue for, either in the name of Assignee or in the name of Assignor, and enforce the rights transferred hereunder, hereby ratifying and confirming all that Assignee may do by virtue hereof.

**Purchase Price; Receipt of Payment.**    The purchase price for the Membership Participation is $500,000.00 (the "Purchase Price"). Assignor acknowledges that Assignor has received full payment by Assignee of the Purchase Price and that such payment constitutes the full consideration for the transfer of the Membership Participation, which transfer is fully consummated by the execution and delivery of this Assignment.

**Representations and Warranties.**

A.  Assignor represents and warrants that (a) he is the sole owner of the Membership Participation; (b) the Membership Participation is held by Assignor free and clear of all liens, charges, claims and encumbrances; (c) Assignor possesses the power and authority in his own right to sell the Membership Participation; (d) the execution, delivery and performance of this Assignment by Assignor and the consummation by him of the transactions contemplated hereby, will not violate any provision of any law, ordinance or regulation or any order, judgment or decree of any court or any governmental authority, or conflict with, result in a breach of or constitute a default under any indenture, mortgage, lease, agreement, contract or instrument to

which Assignor is a party or by which Assignor or any of his properties or assets may be bound, or result in or require the creation of any mortgage, lien or security interest with respect to the Membership Participation or the violation of which is likely to have a material and adverse effect upon the Membership Participation; (e)  Assignor has had an opportunity to ask questions and receive answers regarding the terms and conditions of the sale of the Membership Participation and has had full access to such other information concerning the Company as he has requested, including an opportunity to examine the books and records of the Company and to discuss the condition of the Company; (f) Assignor has waived all rights of appraisal of the value of the Company and any other method of determining the value of the Membership Participation; (g) the Purchase Price constitutes fair and sufficient consideration for the sale of the Membership Participation; and (h) Assignor has been advised to seek the advice of independent counsel with respect to the transactions contemplated by this Assignment.

B.  Assignee represents and warrants that (a) Assignee possesses the power and authority in his own right to purchase the Membership Participation; (b) the execution, delivery and performance of this Assignment by Assignee and the consummation by him of the transactions contemplated hereby, will not violate any provision of any law, ordinance or regulation or any order, judgment or decree of any court or any governmental authority, or conflict with, result in a breach of or constitute a default under any indenture, mortgage, lease, agreement, contract or instrument to which Assignee is a party or by which Assignee or any of his properties or assets may be bound, or result in or require the creation of any mortgage, lien or security interest with respect to the Membership Participation or the violation of which is likely to have a material and adverse effect upon the Membership Participation; (c)  Assignee has had an opportunity to ask questions and receive answers regarding the terms and conditions of the sale of the Membership Participation and has had full access to such other information concerning the Company as he has requested, including an opportunity to examine the books and records of the Company and to discuss the condition of the Company; (d) Assignee has waived all rights of appraisal of the value of the Company and any other method of determining the value of the Membership Participation; (e) the Purchase Price constitutes fair and sufficient consideration for the sale of the Membership Participation; and (f) Assignee has been advised to seek the advice of independent counsel with respect to the transactions contemplated by this Assignment.

C.  These representations and warranties shall survive the date of this Assignment.

**No Rights in Third Parties.**  Nothing expressed or implied in this Assignment is intended to confer upon any person, other than Assignor and Assignee, and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Assignment.

**Successors and Assigns.** This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and legal representatives.

**Release.**

A.     On behalf of itself, its past, present and future partners, officers, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, wholly owned affiliates and/or other related entities, successors, assigns, estate, executor, or any one or more of them, Assignor hereby remises, releases and forever discharges Assignee, its past, present and future members, managers, officers, directors, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, affiliates and/or other related entities, assigns, or any one or more of them, from any and all manner of actions, causes, and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, demands and liabilities, whatsoever, in law or equity, known or unknown, fixed or contingent (including, without limitation, those relating to Assignor's relationship in any employment capacity with respect to the Company or with any related or affiliated entity or individual member of the Company, to the extent of the interest transferred herein), from the beginning of time to the date of this Assignment.

B.     On behalf of itself, its past, present and future partners, officers, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, wholly owned affiliates and/or other related entities, successors, assigns, estate, executor, or any one or more of them, Assignee hereby remises, releases and forever discharges Assignor, its past, present and future members, managers, officers, directors, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, affiliates and/or other related entities, assigns, or any one or more of them, from any and all manner of actions, causes, and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, demands and liabilities, whatsoever, in law or equity, known or unknown, fixed or contingent including, without limitation, those relating to Assignee's relationship in any employment capacity with respect to the Company or with any related or affiliated entity or individual member of the Company, to the extent of the interest transferred herein, arising from the beginning of time to the date of this Assignment.

**Indemnification**.  Assignor agrees to indemnify, defend and hold harmless the Assignee and its agents, shareholders, members, managers, directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignor contained herein.  Assignee agrees to indemnify, defend and hold harmless the Assignor and its agents, shareholders, members, managers, directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignee contained herein.  These indemnifications shall survive the date of this Assignment.

**Governing Law**.  This Assignment shall be governed by, construed and enforced according to the laws of Delaware.

**Headings**.  The section headings contained herein are for convenience only and are not intended to define or limit the contents of such sections.

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed on the date first above written.

Bret A. Broaddus

# EXHIBIT 2

## ASSIGNMENT

**THIS ASSIGNMENT** is executed as of the 31st day of March, 2003 by Bret A. Broaddus, an Illinois resident ("Assignor") in favor of Kevin A. Shields ("Assignee").

**THIS ASSIGNMENT** is made with reference to the following facts:

A.     Assignor is the holder of a 10.00% membership interest (the "Membership Interest") in Will Partners, LLC, a Delaware limited liability company (the "Company").

B.     For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor desires to execute and deliver this Assignment for the purpose of assigning the Membership Interest to Assignee.

**NOW, THEREFORE,** in consideration of the foregoing and intending to be legally bound hereby, Assignor agrees as follows:

**TO HAVE AND TO HOLD,** Assignor does hereby assign, transfer, convey and deliver to Assignee, its successors and assigns, all rights, interests, and titles of Assignor in and to the Membership Interest for Assignee's use and benefit forever, with full power and authority vested in Assignee with respect to the Membership Interest, to demand, receive and to sue for, either in the name of Assignee or in the name of Assignor, and enforce the rights transferred hereunder, hereby ratifying and confirming all that Assignee may do by virtue hereof.

**Purchase Price; Receipt of Payment.** The purchase price for the Membership Interest is $100,000.00 (the "Purchase Price"). Assignor acknowledges that Assignor has received full payment by Assignee of the Purchase Price and that such payment constitutes the full consideration for the transfer of the Membership Interest, which transfer is fully consummated by the execution and delivery of this Assignment.

**Representations and Warranties.**

A.   Assignor represents and warrants that (a) he is the sole owner of the Membership Interest; (b) the Membership Interest is held by Assignor free and clear of all liens, charges, claims and encumbrances; (c) Assignor possesses the power and authority in his own right to sell the Membership Interest; (d) the execution, delivery and performance of this Assignment by Assignor and the consummation by him of the transactions contemplated hereby, will not violate any provision of any law, ordinance or regulation or any order, judgment or decree of any court or any governmental authority, or conflict with, result in a breach of or constitute a default under any indenture, mortgage, lease, agreement, contract or instrument to which Assignor is a party or by which Assignor or any of his properties or assets may be bound, or result in or require the creation of any mortgage, lien or security interest with respect to the Membership Interest or the violation of which is likely to have a material and adverse effect upon the Membership Interest; (e) Assignor has had an opportunity to ask questions and receive answers regarding the terms and conditions of the sale of the Membership Interest and has had full access to such other

information concerning the Company as he has requested, including an opportunity to examine the books and records of the Company and to discuss the condition of the Company; (f) Assignor has waived all rights of appraisal of the value of the Company and any other method of determining the value of the Membership Interest; (g) the Purchase Price constitutes fair and sufficient consideration for the sale of the Membership Interest; and (h) Assignor has been advised to seek the advice of independent counsel with respect to the transactions contemplated by this Assignment.

B.  Assignee represents and warrants that (a) Assignee possesses the power and authority in his own right to purchase the Membership Interest; (b) the execution, delivery and performance of this Assignment by Assignee and the consummation by him of the transactions contemplated hereby, will not violate any provision of any law, ordinance or regulation or any order, judgment or decree of any court or any governmental authority, or conflict with, result in a breach of or constitute a default under any indenture, mortgage, lease, agreement, contract or instrument to which Assignee is a party or by which Assignee or any of his properties or assets may be bound, or result in or require the creation of any mortgage, lien or security interest with respect to the Membership Interest or the violation of which is likely to have a material and adverse effect upon the Membership Interest; (c)  Assignee has had an opportunity to ask questions and receive answers regarding the terms and conditions of the sale of the Membership Interest and has had full access to such other information concerning the Company as he has requested, including an opportunity to examine the books and records of the Company and to discuss the condition of the Company; (d) Assignee has waived all rights of appraisal of the value of the Company and any other method of determining the value of the Membership Interest; (e) the Purchase Price constitutes fair and sufficient consideration for the sale of the Membership Interest; and (f) Assignee has been advised to seek the advice of independent counsel with respect to the transactions contemplated by this Assignment.

C.  These representations and warranties shall survive the date of this Assignment.

**No Rights in Third Parties.**  Nothing expressed or implied in this Assignment is intended to confer upon any person, other than Assignor and Assignee, and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Assignment.

**Successors and Assigns.**  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and legal representatives.

**Release.**

A.          On behalf of itself, its past, present and future partners, officers, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, wholly owned affiliates and/or other related entities, successors, assigns, estate, executor, or any one or more of them, Assignor hereby remises, releases and forever discharges Assignee, its past, present and future members, managers, officers, directors, employees, principals,

agents, attorneys, predecessors, successors, subsidiaries, affiliates and/or other related entities, assigns, or any one or more of them, from any and all manner of actions, causes, and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, demands and liabilities, whatsoever, in law or equity, known or unknown, fixed or contingent (including, without limitation, those relating to Assignor's relationship in any employment capacity with respect to the Company or with any related or affiliated entity or individual member of the Company, to the extent of the interest transferred herein), from the beginning of time to the date of this Assignment.

B.       On behalf of itself, its past, present and future partners, officers, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, wholly owned affiliates and/or other related entities, successors, assigns, estate, executor, or any one or more of them, Assignee hereby remises, releases and forever discharges Assignor, its past, present and future members, managers, officers, directors, employees, principals, agents, attorneys, predecessors, successors, subsidiaries, affiliates and/or other related entities, assigns, or any one or more of them, from any and all manner of actions, causes, and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, demands and liabilities, whatsoever, in law or equity, known or unknown, fixed or contingent including, without limitation, those relating to Assignee's relationship in any employment capacity with respect to the Company or with any related or affiliated entity or individual member of the Company, to the extent of the interest transferred herein, arising from the beginning of time to the date of this Assignment.

**Indemnification.**  Assignor agrees to indemnify, defend and hold harmless the Assignee and its agents, shareholders, members, managers, directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignor contained herein.  Assignee agrees to indemnify, defend and hold harmless the Assignor and its agents, shareholders, members, managers, directors, affiliates, employees, insurers, successors, heirs, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Assignee contained herein.  These indemnifications shall survive the date of this Assignment.

**Governing Law.**   This Assignment shall be governed by, construed and enforced according to the laws of Delaware.

**Headings**.  The section headings contained herein are for convenience only and are not intended to define or limit the contents of such sections.

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed on the date first above written.

Bret A. Broaddus

**EXHIBIT 3**

**WILL PARTNERS, LLC**

**FIRST AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

# TABLE OF CONTENTS

Page

SECTION 1  THE COMPANY ...........................................................................................1

    1.1      Formation ...............................................................................................1
    1.2      Name ......................................................................................................1
    1.3      Purpose ..................................................................................................1
    1.4      Principal Office ......................................................................................4
    1.5      Registered Agent and Office..................................................................4
    1.6      Term ......................................................................................................4
    1.7      Statutory Compliance............................................................................4
    1.8      Title to Property ....................................................................................5
    1.9      Independent Activities; Transactions With Affiliates............................5
    1.10   Definitions.............................................................................................5

SECTION 2  MEMBERS' CAPITAL CONTRIBUTIONS .......................................10

    2.1      Capital Contributions ..........................................................................10
    2.2      Other Matters ......................................................................................10

SECTION 3  ALLOCATIONS ......................................................................................11

    3.1      Profits and Losses ...............................................................................11
    3.2      Regulatory Allocations ........................................................................11
    3.3      Tax Allocations:  Code Section 704(c) ...............................................12
    3.4      WKI Priority Returns ..........................................................................12

SECTION 4  DISTRIBUTIONS ....................................................................................14

    4.1      Definition of Net Cash Flow ...............................................................14
    4.2      Definition of Net Proceeds ..................................................................15
    4.3      Distribution of Net Cash Flow and Net Proceeds ...............................15
    4.4      In-Kind Distribution............................................................................15
    4.5      WKI Priority Returns...........................................................................15
    4.6      General Tax Allocations ......................................................................16
    4.6      Special Tax Allocations .......................................................................17

SECTION 5  MANAGEMENT .....................................................................................19

    5.1      Management .........................................................................................19
    5.2      Specified Actions ................................................................................19

SECTION 6  INDEMNIFICATION OF MEMBERS...................................................20

    6.1      Indemnification ...................................................................................20
    6.2      Limitations ..........................................................................................21

SECTION 7  ACCOUNTING, BOOKS AND RECORDS ...........................................21

    7.1      Accounting, Books and Records ..........................................................21
    7.2      Tax Returns; Information .....................................................................21
    7.3      Tax Matters Member ...........................................................................22

# TABLE OF CONTENTS

Page

SECTION 8  AMENDMENTS; MEETINGS ..................................................................22

    8.1    Amendments ...........................................................................................22
    8.2    Meetings .................................................................................................22

SECTION 9  TRANSFERS OF INTERESTS ..............................................................22

    9.1    Restrictions on Transfers ......................................................................22
    9.2    Permitted Transfers ...............................................................................22

SECTION 10  WITHDRAWALS; ACTION FOR PARTITION; BREACHES ............24

    10.1    Waiver of Partition ................................................................................24
    10.2    Covenant Not to Withdraw or Dissolve ................................................24
    10.3    Consequences of Violation of Covenants ..............................................24
    10.4    Breach Payments ...................................................................................25
    10.5    No Bonding ............................................................................................25
    10.6    Net Equity ..............................................................................................26

SECTION 11  BUY-SELL ............................................................................................27

    11.1    Buy-Sell .................................................................................................27
    11.2    Net Stated Equity ..................................................................................28
    11.3    WKI Buyout. ..........................................................................................29

SECTION 12  DISSOLUTION AND WINDING UP ...................................................29

    12.1    Liquidating Events ................................................................................29
    12.2    Winding Up ............................................................................................30
    12.3    Rights of Members ................................................................................31

SECTION 13  MISCELLANEOUS ..............................................................................31

    13.1    Notices ...................................................................................................31
    13.2    Binding Effect .......................................................................................31
    13.3    Construction ..........................................................................................31
    13.4    Time ......................................................................................................31
    13.5    Headings ................................................................................................31
    13.6    Severability ...........................................................................................31
    13.7    Further Action .......................................................................................32
    13.8    Variation of Pronouns ...........................................................................32
    13.9    Governing Law ......................................................................................32
    13.10    Counterpart Execution ...........................................................................32
    13.11    Entire Agreement ..................................................................................32
    13.12    Attorneys Fees.......................................................................................32

# WILL PARTNERS, LLC

## FIRST AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

**This First Amended and Restated Limited Liability Company Agreement** ("**Agreement**") of **WILL PARTNERS, LLC** (the "Company") is entered into and shall be effective as of April 26, 2000, by and among **WILL ACQUISITIONS, INC.,** a Delaware corporation ("**WAI**"), **KEVIN A. SHIELDS** ("Shields"), **DON G. PESCARA** and **WORLD KITCHEN INC.,** a Delaware corporation ("**WKI**") (collectively, the "Members") pursuant to the provisions of the Delaware Limited Liability Company Act (the "Act"). This Agreement amends and restates the original limited liability company agreement of Will Partners, LLC, dated as of May 13, 1999 among Will Acquisitions, LLC, a Delaware limited liability company, Kevin A. Shields, Don G. Pescara, and Will W. O'Leary (the "Original LLC Agreement"), on the following terms and conditions:

## SECTION 1

## THE COMPANY

**1.1    Formation; Admission of WKI.** Pursuant to the Original LLC Agreement, the Company has previously been formed as a Delaware limited liability company effective as of the date thereof pursuant to and in accordance with the Act for the purpose set forth in Section 1.3, below. In consideration for WKI (successor in interest to Ekco Housewares, Inc. ("Ekco") by Assignment and Assumption dated April 26, 2000) agreeing to (i) terminate on the date hereof that certain Cash Flow Distribution Agreement dated as of May 15, 1999 between Ekco and Will Acquisitions, LLC (the former managing member of the Company), (ii) grant its consent to the Company entering into a refinancing of the loan secured by liens encumbering the Company's assets, and (iii) amend and restate the Lease between the Company and Ekco (as assigned to WKI), WKI is being admitted as a member of the Company on the date hereof.

**1.2    Name.** The name of the Company shall be Will Partners, LLC and all business of the Company shall be conducted in that name. The Company shall hold all of its property in the name of the Company and not in the name of any Member.

**1.3    Purpose.** The sole and exclusive purposes of the Company are to acquire the Property and to own, manage, operate, lease, alter, improve and maintain the Property and to transact any and all lawful business for which a limited liability company may be organized under the laws of Delaware that is incident, necessary and appropriate to accomplish the foregoing. Except as provided above, the Company shall not engage in any other activities or businesses. To clarify more specifically the Company's intentions and obligations and in connection with its covenants and obligations made to WKI hereunder and in obtaining certain permanent financing of the completed development of the Property from Wells Fargo Bank, National Association (the current "Loan" pursuant to Section 1.9.(r) hereof, the Company hereby

adopts the following additional provisions of operation in furtherance of its purpose, which additional provisions shall be in full force and effect until the full performance by the Company of its obligations under all documents evidencing the Loan ("Loan Documents") and until such time as the Company's obligations to WKI under the provisions of Section 3.4(a) and 4.5 are fulfilled:

(a)    The Company has been organized solely for the purpose of owning the Property;

(b)    The Company has not and will not engage in any business unrelated to ownership of the Property;

(c)    The Company has not and will not have any assets other than the Property (and personal property incidental to the ownership and operation of the Property).

(d)    The Company has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale, transfer of membership interests, or amendment of its certificate of formation, or this Agreement, except as expressly permitted under the Loan Documents.

(e)    The Company shall retain WAI as Manager, and that WAI shall similarly comply with all of the restrictions set forth in this Section 1.3 for the duration required herein.

(f)    The Company shall not, without the unanimous written consent of all of the Members, file or consent to the filing of any bankruptcy or insolvency petition or otherwise institute bankruptcy proceedings.

(g)    The Company has no indebtedness (and will have no indebtedness) other than (i) the Loan (to the extent it is liable under the terms of the Loan Documents); and (ii) unsecured trade debt which is not evidenced by a note and is incurred in the ordinary course of the Company's business in connection with owning, operating and maintaining the Property and is paid within thirty (30) days from the date incurred.

(h)    The Company has not and will not fail to correct any known misunderstanding regarding the separate identity of the Company.

(i)    The Company has maintained and will maintain based upon generally accepted accounting principals, its accounts, books and records, including its financial statements, accounting records and entity documents separate and apart from any other person or entity.

(j)    The Company has maintained and will maintain its books, records, resolutions and agreements as official records.

(k)    The Company (i) has not and will not commingle its funds or assets with those of any other entity; and (ii) has held and will hold its assets in its own name separate and apart from those of any other person or entity.

(l)    The Company has conducted and will conduct its business in its own name.

(m)    The Company has maintained and will maintain its financial statements, accounting records, and other entity documents separate from any other person or entity and has prepared and will prepare separate tax returns and financial statements for the Company and will not file a consolidated return with any other entity.

(n)    The Company has paid and will pay its own liabilities and expenses out of its own funds and assets, to the extent such funds are available.

(o)    The Company has held and will hold regular meetings, as appropriate, to conduct its business and has observed all limited liability company formalities and record keeping.

(p)    The Company has not and will not assume or guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of any other entity except for liabilities permitted to be guaranteed by the provisions of the Loan Documents.

(q)    The Company has not and will not acquire obligations or securities of its members.

(r)    The Company has allocated and will allocate fairly and reasonably the costs associated with any overhead expenses including common employees and shared office space and has and will use separate stationary, invoices, checks and business forms bearing only its own name.

(s)    The Company has not and will not pledge its assets for the benefit of any other person or entity.

(t)    The Company has held and identified itself and will hold and identify itself as a separate and distinct entity under its own name and not as a division or part of any other person or entity.

(u)    The Company has not and will not make loans to any person or entity or buy or evidence of indebtedness issued by any other person or entity (other than cash and investment grade securities).

(v)    The Company has not and will not identify its Members as or any affiliates of the foregoing as a division or part of it and will correct any known misunderstanding regarding its separate identity.

(w)    Except for the WKI Priority Returns defined in Section 3.4 of this Agreement and the rights and remedies of WKI in the Lease identified in Section 3.4 of this Agreement and except as permitted in the Loan Documents, the Company has not entered into and will not enter into or be a party to, any transaction with it Members, or any affiliates of any of the foregoing, except in the ordinary course of its business pursuant to written agreements and

on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's length transaction with an unrelated third party.

      **(x)**    The Company has paid and will pay the salaries of its own employees and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations.

      **(y)**    The Company has maintained and will maintain adequate capital in light of its contemplated business operations.

      **(z)**    The Company shall conduct its business, to the fullest extent permitted by applicable law, in strict compliance with the provisions contained in this Section 1.3 and has not and will not permit any entity or person, by commission or omission, to take any action contrary or in derogation to any of the aforegoing or fail to correct any known misrepresentation with respect to the foregoing.

In the event of a conflict between the provisions of this Section 1.3 and any other provision of this Agreement, the provisions of this Section 1.3 shall control.

    **1.4**    **Principal Office.**  The Company shall maintain its principal office at 3421 Manhattan Avenue, Manhattan Beach, California 90266-3359 or at such other place or places as may be determined by the Managing Member.

    **1.5**    **Registered Agent and Office.**  The name of the registered agent for service of process and the address of the Company's registered office in the State of Delaware shall be Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, or such other agent or office in the State of Delaware as the Managing Member may from time to time designate.

    **1.6**    **Term.**  The term of the Company shall commence on the date hereof and shall continue until the earlier of (i) ninety nine (99) years from the date of its certificate of formation or (ii) winding up and liquidation of the Company and its business is completed following a "Liquidating Event," as provided in Section 12 hereof.

    **1.7**    **Statutory Compliance.**  The Company shall exist under and be governed by, and this Agreement shall be construed in accordance with, the applicable laws of the State of Delaware. The Managing Member shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Member shall execute and file in the appropriate records any assumed or fictitious name certificates and other documents and instruments as may be necessary or appropriate with respect to the formation of, and conduct of business by, the Company.

    **1.8**    **Title to Property.**  All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The Company shall only hold all of its real and personal property in the name of the Company and not in the name of any Member.

**1.9**　　**Independent Activities; Transactions With Affiliates**.

　　　　(a)　　Each Member and any of its Affiliates shall be required to devote only such time to the affairs of the Company as such Member determines in its sole discretion may be necessary to manage and operate the Company, and each such Person, to the extent not otherwise directed by such Member, shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

　　　　(b)　　Insofar as permitted by applicable law, each Member (acting on its own behalf) and its Affiliates may, notwithstanding this Agreement, engage in whatever activities it chooses, whether the same are competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or its Affiliates from engaging in such activities, or require any Member to permit the Company or any Member or its Affiliates to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

　　**1.10**　　**Definitions.**　Capitalized words and phrases used in this Agreement have the following meanings:

　　　　(a)　　"Act" means the Delaware Limited Liability Company Act, as set forth in Title 6 of the Delaware General Corporation Law, as amended from time to time (or any corresponding provisions of succeeding law).

　　　　(b)　　"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director, manager, managing member or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

　　　　(c)　　"Agreement" means this Limited Liability Company Agreement, as amended from time to time.  Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

　　　　(d)　　"Appraisers' Notice" has the meaning set forth in Section 10.6 hereof.

　　　　(e)　　"Bankruptcy Action" means, with respect to any Person, any of the following:

　　　　　　(i)　　Taking any action that might cause the Company to become insolvent.

(ii)      Commencing any case, proceeding or other action on behalf of the Company under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors.

(iii)      Instituting proceedings to have the Company adjudicated as bankrupt or insolvent.

(iv)      Consenting to the institution of bankruptcy or insolvency proceedings against the Company.

(v)      Filing a petition or consent to a petition seeking reorganization arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief on behalf of the Company of its debts under any federal or state law relating to bankruptcy.

(vi)      Seeking or consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Company or a substantial portion of its assets.

(vii)      Making any assignment for the benefit of the Company's creditors.

(viii)      Admitting in writing its inability to pay its debts generally as they become due.

(ix)      Taking any action in furtherance of any of the foregoing.

(f)      "Breach Amount" has the meaning set forth in Section 10.4 hereof.

(g)      "Breach Payments" has the meaning set forth in Section 10.4 hereof.

(h)      "Breaching Member" has the meaning set forth in Section 10.3 hereof.

(i)      "Business Day" means a day of the year on which banks are not required or authorized to close in Los Angeles.

(j)      "Capital Account" means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)      To each Person's Capital Account there shall be credited such Member's Capital Contributions and such Member's distributive share of Profits.

(ii)      To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement and such Member's distributive share of Losses.

(iii)      In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

The foregoing provisions and the other provisions of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.

(k)    "Capital Contributions" means, with respect to any Member, the amount of money and the agreed initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Company interest held by such Member pursuant to the terms of this Agreement.

(l)    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law.)

(m)    "Company" means the limited liability company formed by this Agreement and the limited liability company continuing the business of this Company in the event of dissolution as herein provided.

(n)    "First Appraiser" has the meaning set forth in Section 10.6 hereof.

(o)    "Fiscal Year" means (i) the period commencing on the effective date of this Agreement and ending on December 31, 1999, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31 or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 3 hereof.

(p)    "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Managing Member;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Company to a Member of more than a *de minimis* amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution; and

   **(iv)** The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)*(m)*.

   **(q)** "Liquidating Event" has the meaning set forth in Section 12 hereof.

   **(r)** "Loan" shall mean the indebtedness relating to the purchase of the Property or the initial construction of the improvements on the Property or the permanent financing of the completed development of the Property, or any renewals, modifications or refinancings of the same.

   **(s)** "Management Agreement" has the meaning set forth in Section 5.2(g) hereof.

   **(t)** "Managing Member" means WAI and such other Managing Member appointed in accordance with this Agreement.

   **(u)** "Members" means those individuals and entities executing this Agreement as Members. "Member" means any one of the Members.

   **(v)** "Net Cash Flow" and "Net Proceeds" have the meanings set forth in Sections 4.1 and 4.2, respectively.

   **(w)** "Net Equity" has the meaning set forth in Section 10.6 hereof.

   **(x)** "Net Stated Equity" has the meaning set forth in Section 11.2 hereof.

   **(y)** "Percentage Interest" means, with respect to any Member, the percentage interest set forth opposite such Member's name on Exhibit A attached hereto. In the event any Company interest is transferred in accordance with the provisions of this Agreement, the transferee of such interest shall succeed to the Percentage Interest of his transferor to the extent it relates to the transferred interest.

   **(z)** "Permitted Transfer" has the meaning set forth in Section 9.2(b)(i) hereof.

   **(aa)** "Permitted Transferee" has the meaning set forth in Section 9.2(b)(ii) hereof.

   **(bb)** "Person" means any individual, partnership, corporation, limited liability company, trust, or other entity.

   **(cc)** "Priority Return" means the payments required to be made to WKI pursuant to Section 3.4, which payments shall be made with all funds of Company available after payments of debt service, or any other payments required under, any Loan.

**(dd)** "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

**(i)** Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

**(ii)** Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

**(iii)** In the event the Gross Asset Value of any Company asset is adjusted pursuant to this Agreement, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

**(iv)** Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

**(v)** In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year, based on adjusted Gross Asset Value;

**(vi)** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)*(m)(4)* to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

**(ee)** "Property" means the real property described on Exhibit B hereto.

**(ff)** "Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**(gg)** "Second Appraiser" has the meaning set forth in Section 10.6 hereof.

**(hh)** "Third Appraiser" has the meaning set forth in Section 10.6 hereof.

(ii)    "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, or other disposition (including a hypothecation) and, as a verb, voluntarily or involuntarily to transfer, sell, or otherwise dispose of.

(jj)    "Wholly Owned Affiliate" of any Person shall mean (i) an Affiliate of such Person one hundred percent (100%) of the voting stock or beneficial ownership of which is owned directly by such Person, or by any Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, (ii) an Affiliate of such Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, and (iii) any Wholly Owned Affiliate of any Affiliate described in clause (i) or clause (ii) above.

## SECTION 2

## MEMBERS' CAPITAL CONTRIBUTIONS

2.1    **Capital Contributions.**  The Members' Capital Contributions are set forth on Exhibit A hereto.

2.2    **Other Matters**.

(a)    Except as otherwise provided in this Agreement, no Member shall demand or receive a return of its Capital Contributions or withdraw from the Company without the consent of all Members.  Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(b)    No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as Member, except as otherwise provided in this Agreement.

(c)    Except as otherwise provided in Section 9 hereof, relating to Transfers of Company interests, no Person shall be admitted to the Company as a Member without the unanimous consent of the Managing Member.

(d)    No Member shall be obligated to make any capital contribution in excess of the amounts specified in Section 2.1.

## SECTION 3

## ALLOCATIONS

3.1    **Profits and Losses.**  Except as otherwise provided in Section 3.2 and Section 3.4(e), Profits and Losses for any Fiscal Year shall be allocated among the Members in the proportion in which their share in distributions under Section 4.3 were made for such Fiscal Year.

3.2    **Regulatory Allocations**.

(a)    **Allocation Adjustments Required to Comply With Section 704(b) of the Code.**

(i)    **Limitations On Allocation of Losses.**    There shall be no allocation of Losses to any Member which would create or increase a deficit balance in such Member's Capital Account (in excess of such Member's allocable share of minimum gain as determined under Regulation 1.704-2) unless such allocation would be treated as valid under Section 704(b) of the Code.

(ii)    **Qualified Income Offset.**    Notwithstanding the provisions of Section 3.1, if in any Fiscal Year a Member receives (or is reasonably expected to receive) a distribution, or an allocation or adjustment to such Member's Capital Account, that creates or increases (or is reasonably expected to create or increase) a deficit balance in such Member's Capital Account, there shall be allocated to the Member such items of Company income or gain as are necessary to satisfy the requirements of a "qualified income offset" within the meaning of Regulation Section 1.704-1(b).

(iii)    **Minimum Gain Chargeback.**    Notwithstanding the provisions of Section 3.1, this Section 3.2(a)(iii) hereby incorporates by reference the "minimum gain chargeback" provisions of Regulation Section 1.704-2.    In general, upon a reduction of the Company's minimum gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of nonrecourse and member nonrecourse deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 3.2(d), are allocable to increases in the Company's minimum gain.    Subject to the provisions of Section 704 of the Code and the Regulations thereunder, if the Managing Member determine at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Managing Member shall adjust the allocation provisions of this Section 3.2 as necessary to accomplish that result.

(iv)    **Allocations Subsequent to Certain Allocation Adjustments.** Any allocations of items of Profits or Losses pursuant to Section 3.2(a)(i) or (ii) shall be taken into account in computing subsequent allocations pursuant to Section 3.1 so that the net amount of any items so allocated and all other items allocated to each Member pursuant to Section 3.1 shall, to the extent possible, be equal to the net amount that would have been allocated to each Member pursuant to the provisions of Section 3.1 without application of Section 3.2.

(b)    **Book - Tax Accounting Disparities.**    If Company property is reflected in the Capital Accounts of the Members at a book value that differs from the adjusted tax basis of such property, allocations of depreciation, amortization, income, gain or loss with respect to such property shall be allocated among the Members so as to take into account any such variation between the adjusted basis of such property and its fair market value.    Allocations pursuant to this Section 3.2(b) are solely for purposes of federal, state and local taxes and shall not affect in any way any Member's Capital Account or distributive share of distributions and allocations of Profits and Losses.

(c)    **Modifications to Preserve Underlying Economic Objectives.**  If, in the opinion of counsel to the Company, there is a change in the Federal income tax law (including the Code as well as the regulations, rulings, and administrative practices thereunder) or an ambiguity in this Agreement which makes it necessary or prudent to modify the allocation provisions of this Section 3.2 in order to preserve the underlying economic objectives of the Members as reflected in this Agreement, the Managing Member shall upon prior written notice to all of the Members make the minimum modification necessary to achieve such purpose.

(d)    **Nonallocation of Distributions to Increases in Minimum Gain.**  To the extent permitted under Regulation Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company's minimum gain.  In general, and except as provided in such Regulation, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 3.2(a)(iii).

(e)    **Allocation of Liabilities.**  Solely for purposes of determining the Members' respective shares of the Company's "non-recourse liabilities" within the meaning of Regulation Section 1.752-3(a)(3), each Member's interest in Company Profits shall equal such Member's Percentage Interest.

**3.3    Tax Allocations: Code Section 704(c).**  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.  In the event the Gross Asset Value of any Company asset is adjusted under this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Allocations pursuant to this Section 3.3 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement.

**3.4    WKI Priority Returns.**

(a)    Subject to Section 4.5, for each of the periods set forth below during which WKI is a Member until the one hundred eightieth (180th) full calendar month of the term of that certain Amended and Restated Lease dated as of May 13, 1999 for the Property between WKI and the Company ("Lease") the terms of which are hereby incorporated herein by this reference, WKI shall be paid a priority distribution in an amount equal to the amount set forth below for the applicable period indicated below (each individually a "Priority Return" and collectively, the "Priority Returns"), in each case payable within the time specified in Section 4.5(a).

| Period | Priority Distribution/ Month | Priority Distributions/ Annum |
|---|---|---|

| | | |
|---|---|---|
| Rent Commencement Date through 12th full calendar month | $43,498.33 | $521,980.00 |
| 13th through 24th full calendar month | $43,498.33 | $521,980.00 |
| 25th through 60th Full calendar month | $43,498.33 | $521,980.00 |
| 61th through 120th Full calendar month | $49,165.00 | $589,980.00 |
| 121st through 180th Full calendar month | $62,437.50 | $749,250.00 |

(b)     In addition, and notwithstanding anything contained herein to the contrary, any payment, cost or amount due WKI pursuant to Sections 4.6, 7.1 or 8.2 of the Lease or pursuant to the Reserve Reimbursement Agreement dated as of even date herewith between the Company and WKI, which are recovered by WKI pursuant to the Offset and Recapture Procedure (as defined in the Lease) shall not be deemed a reduction in the Basic Rent paid by Lessee and accordingly shall be disregarded for purposes of calculating the amount of the Priority Return payable to WKI. If, at the expiration of the term of the Lease (as the same may be extended) WKI has not fully recovered any of the amounts described in Section 8.2 of the Lease,  and provided no Event of Default (as defined in the Lease) has occurred, WKI shall receive a Priority Return equal to any unpaid Offset Amount arising pursuant to Section 8.2 of the Lease.

(c)     Intentionally omitted.

(d)     In the event WKI is paying the rental obligations under the Lease net of the Priority Returns directly to a Lender or loan Servicer then WKI agrees that it will make the Replacement Reserve Payment directly with such Servicer or to the Lender as directed by the Lender pursuant to the Escrow Agreement.

(e)     WKI shall receive no allocations of Company Profits or Losses provided that, notwithstanding any other provision hereof, Profit for each Fiscal Year shall be allocated to WKI in an amount equal to the amount of Priority Returns paid to WKI (as reduced pursuant to Section 3.4(c), 4.5 or 5.2) with respect to each Fiscal Year.  Notwithstanding anything contained herein to the contrary, from and after the one hundred eightieth (180th) full calendar month of the Lease term, no Priority Return shall be due to WKI..

## SECTION 4

### DISTRIBUTIONS AND TAX ALLOCATIONS

4.1    **Definition of Net Cash Flow.**  "Net Cash Flow" shall consist of the gross cash receipts received by the Company of any kind or description from the Property during a calendar

month or quarter (as the case may be), except the gross proceeds from transactions described in Section 4.2, less the deductions described in Subsection (a) below.

(a)    **Deductions.**    For purposes of calculating Net Cash Flow, the following shall be deducted from the gross cash receipts of the Company:

(i)    all costs of acquiring, improving, developing, managing, leasing, operating, maintaining, replacing, and preserving the Property to the extent paid in cash during such calendar month or quarter (but not including any such payments to the extent that the amounts thereof were reserved against and funded from such reserves);

(ii)    all other operating or other expenses of the Company attributable to the Property paid in cash during such calendar month, or any expenditures for casualty losses to the extent that such losses are not reimbursed during such month by any third party responsible therefor, or through insurance maintained by the Company, but not including any expenses paid in cash to the extent that such expenses were reserved against and funded from such reserves;

(iii)    all cash payments made with respect to the discharge of Company indebtedness during the calendar month, but not including any such payments to the extent that the amounts thereof were reserved against and funded from such reserves;

(iv)    all amounts of reserved cash as reasonably determined by the Managing Member for (1) the repayment of Company indebtedness coming due in the future; (2) the acquisition, improvement, development, management, operation, (including, but not limited to, insurance and property taxes and assessments), maintenance, replacement or preservation of the Property; and (3) increases in working capital and other contingencies. At such times as the Managing Member reasonably determine that amounts reserved under this Section 4.1(a)(iv) are no longer necessary to be so reserved, such amounts shall, for purposes of calculating Net Cash Flow thereafter, be added to the gross cash receipts of the Company for the month in which such determination is made; and

(v)    subject to Section 4.5, all amounts payable to WKI pursuant to Section 3.4.

(b)    **No Deduction for Depreciation.**    In computing Net Cash Flow, no deduction shall be made for depreciation or amortization as such terms are used for purposes of the Code.

4.2    **Definition of Net Proceeds.**    As used in this Agreement, "Net Proceeds" shall be determined as follows:

(a)    With respect to any sale, transfer, conveyance, or condemnation pursuant to power of eminent domain or conveyance in lieu thereof, failure of title or other transfer or loss of all or substantially all of the Property, including damage to such a substantial portion of the Property that the Property cannot be reconstructed or rebuilt within a reasonable time to permit the economic use of the Property (the foregoing are referred to collectively hereinafter as a "Complete Disposition"), the Net Proceeds shall equal the gross proceeds received by the

Company as a result of such Complete Disposition (including, without limitation, the fair market value of any non-cash consideration received by the Company) less all costs and expenses relating thereto payable by the Company to third parties.

      **(b)**      With respect to any refinancing obtained by the Company which is secured by a lien on any of the Property or any portion thereof (referred to hereinafter as a "Financing"), the Net Proceeds shall equal the total principal amount of any such Financing received by the Company less (i) that portion of the Financing which is used for the purpose of acquiring or improving the Property, (ii) the costs of such Financing, and (iii) the amount of any debt (principal and interest) retired by such Financing.

      **4.3**      **Distribution of Net Cash Flow and Net Proceeds.**  Except as provided in Section 12.2 hereof, and subject to Section 4.5, all Net Cash Flow and Net Proceeds for any period shall be distributed to the Members pro rata in accordance with their Percentage Interests no later than March 15 of the succeeding Fiscal Year.

      **4.4**      **In-Kind Distribution.**  Assets of the Company (other than cash) may be distributed in kind to the Members in the discretion of the Managing Member.  If any assets of the Company are distributed to the Members in kind, such assets shall be valued on the basis of the fair market value thereof on the date of distribution, and any Member entitled to any interest in such assets shall receive such interest as a tenant-in-common with all other Members so entitled.

      **4.5**      **WKI Priority Returns.**  **(a)** Subject to the provisions of this Section 4.5 and the last sentence of Section 5.2, (i) the Company (either through the method contemplated at Section 4.5(c) below or through a servicing agent or lock box arrangement) shall pay to WKI cash in the amount of the Priority Returns described in Section 3.4, within 5 days after receipt of the applicable Basic Monthly Rent (as defined in the Lease) for the month to which the Priority Return relates (the "Applicable Rent"); and (ii) the Company shall not make distributions to the other Members until all of the applicable monthly Priority Return has been paid.  If the Priority Returns are not paid to WKI within such 5 day period, the Company shall pay interest on such Priority Returns to WKI at the Overdue Rate (as defined in the Lease) or the maximum rate permitted by law, whichever is lesser, from the expiration of the 5 day period until such Priority Returns are actually paid to WKI.

      **(b)**      The payment to WKI of the Priority Returns (i) shall be contingent upon receipt by the Company from WKI of the Applicable Rent, and (ii) shall be tolled during any grace or cure period, if any, under the Lease during which WKI has not paid the Applicable Rent, but such tolled amount shall be paid to WKI within five (5) days after receipt of the Applicable Rent, regardless of whether or not such payment of the Applicable Rent is received after any such grace or cure period permitted for the Event of Default in question (provided that none of the events contemplated in Section 4.5(d) which would permanently suspend the obligation for the Priority Return have occurred).  To the extent Lender is at any time disbursing the Priority Return from the Applicable Rent, Lender shall be relieved of any obligation to tender the Priority Return to WKI in the event it receives a notice from Company that (i) any event under Section 4.5(b) has occurred which entitles the Company not to pay the Priority Return; or (ii) any of the

events described in Section 4.5(d) (i), (ii) or (iii) has occurred (hereinafter a "Section 4.5 Notice").

(c)    Subject to Lender's consent, WKI shall be allowed to deduct the amount of the Priority Returns from the applicable Basic Monthly Rent (as defined in the Lease) payable under the Lease and upon such deduction, the applicable Priority Return shall be deemed paid to WKI in compliance with the provisions of this Agreement, without any further action by the Company.

(d)    Upon (i) a termination of the Lease, (ii) occurrence of an Event of Default (as defined in the Lease) resulting in a reletting of all or portions of the Premises pursuant to Article XVII of the Lease (whether or not the Company elects to terminate the Lease), or (iii) an amendment to the Lease pursuant to the last sentence of Section 5.2, WKI's right to receive the Priority Return shall terminate and be of no further force and effect. If WKI is in default under the Lease, but the Lease has not been terminated, WKI shall be entitled to receive the Priority Return upon all of the terms and conditions contained herein (including the payment to and receipt by the Company of the Applicable Rent). If the Company terminates the Lease and sues WKI pursuant to Article XVII of the Lease for the rent that would have been payable had the Lease not been terminated, the amount of such rent to be paid by WKI shall be reduced by the amount of any Priority Return applicable to the period for which such rent is collected.

(e)    Subject to its rights under this Section 4.5 and under Section 3.4 to be paid the Priority Return, WKI shall not be entitled to any distributions from the Company.

(f)    Notwithstanding that the Percentage Interest of the WKI is zero, for the consideration set forth in Section 1.1 above, WKI shall be entitled to the Priority Return in accordance with this Section 4.5.

**4.6    General Tax Allocations**

(a)    Except as provided in Section 3.4(e) and Section 4.7, Profits of the Company shall be allocated in the following manner:

(i)    First, to each Member (exclusive of WKI) who has a deficit in its Capital Account, in proportion to such deficit, until the deficit is reduced to zero.

(ii)    Second, to each of the Members (other than WKI) in an amount equal to and in proportion to the amounts distributable to them under Section 4.3.

(iii)    Third, to the Members (other than WKI), pro rata in accordance with their Percentage Interests.

(b)    Except as otherwise provided in Section 4.7, Losses of the Company shall be allocated in the following manner:

(i)    To each of the Members (other than WKI) who have been allocated Profits in accordance with Sections 4.6(a)(ii) and (iii) in excess of Losses allocated pursuant to this Section 4.6(b), in an amount equal to and in proportion to such excess.

(ii)    To each of the Members (other than WKI) with positive Capital Account balances, in proportion to such positive Capital Account balances, until all such positive Capital Account balances are reduced to zero.

(iii)    Thereafter, to the Members (other than WKI) in proportion to their Percentage Interests.

**4.7    Special Tax Allocations**

(a)    Notwithstanding any other provision of this Agreement, any Member (other than WKI) who unexpectedly receives an adjustment, allocation, or distribution described in subparagraphs (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii)(d), and which causes a deficit balance in such Member's Capital Account, shall be allocated items of book income and gain in an amount and manner sufficient to eliminate or to reduce, as quickly as possible, the deficit so created or increased. This provision is intended to constitute a "qualified income offset" as described in Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith. Such section of the Regulations shall control in the case of any conflict between that section of the Regulations and this Section.

(b)    In the event that a Member (other than WKI) has a deficit Capital Account at the end of any fiscal year, such Member shall be allocated items of book income and gain in an amount and manner sufficient to eliminate or to reduce, as quickly as possible, the deficit so created or increased; provided that an allocation pursuant to this Section 4.7(b) shall be made only if and to the extent that the Member would have a deficit Capital Account balance after all other allocations provided for in this Section 4.7 have been tentatively made as if this Section 4.7(b) were not in this Agreement.

(c)    Notwithstanding any other provision of this Agreement, in the event of a net decrease in Company minimum gain for a taxable year, each Member (other than WKI) shall be allocated items of Company income and gain for such year (and if necessary subsequent years) equal to that Member's share of the net decrease in minimum gain. This provision is intended to constitute a minimum gain chargeback provision within the meaning of Regulations Section 1.704-2(f) and shall be interpreted in a manner consistent therewith.

(d)    Notwithstanding any other provision of this Agreement but subject to Section 1.3, in the event that a nonrecourse liability of the Company is loaned to the Company by a Member (other than WKI) or guaranteed by a Member such that such Member bears the economic risk of loss with respect to that liability as described under Regulations Section 1.752-2, the rules under Regulations Section 1.704-2(i) shall govern the allocation of any items of income, gain, loss or deduction in connection with such liability.

(e)    The profit, gain or loss allocable to any Membership Interest (other than WKI's) in the Company which may have been transferred during any year shall be allocated among the persons who were the holders of such interest during such year in proportion to the number of calendar days that each such holder was recognized as the owner of the interest during such year, without regard to (i) the results of Company operations during the period in which the holders were recognized as the owners thereof, and (ii) the date, amount or recipient of any

distributions which may have been made with respect to such interest; provided, that the allocation of gain or loss on the disposition of any property or interest in which the Company has a direct or indirect interest shall be based on the interests of the Members (other than WKI) on the date the event giving rise to such gain or loss occurs.

(f)     If there is a transfer of a Membership Interest (other than WKI's) permitted by this Agreement, or if there is a distribution of Company property to a Member, at the request of a transferee or a distributee, the Managers shall cause the Company to file an election pursuant to Code Section 754 to cause the tax basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Code Section 734 or Code Section 743, as may be applicable.

(g)     In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose book value differs from its adjusted basis for federal income tax purposes, shall, for tax purposes, be allocated among the Members (other than WKI) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its book value. Any elections or other decisions relating to such allocations shall be made by the Members (other than WKI) in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 9.7 are solely for purposes of federal, state, and local taxes and shall not effect, or in any way be taken into account in computing, any Member's share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Agreement.

(h)     To the extent possible, the Company, in allocating items of income, gain, loss, or deduction among the Members (other than WKI) pursuant to this Article 9, shall take into account the special allocations in such a manner that the net amount of allocations to each Member shall be the same as such Member's allocable share of Net Profits, Net Losses or other items of gain or loss would have been had the events requiring the special allocations not taken place. The Company shall apply the provisions of this Article 9 in whatever order the Manager reasonably determines will minimize any economic distortion that otherwise might result from the application of the special allocations.

(i)     The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that would occur under Article 4.  To the extent that the tax allocation provisions of this Agreement would not produce the desired Target Final Balances, the Members (other than WKI) agree to take such actions as are necessary to amend such tax allocation provisions to produce such Target Final Balances.  Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss, and deductions shall be made prospectively as necessary to produce such Target Final Balances (and to the extent such prospective allocations would not effect such result, the prior tax returns of the Company shall be amended to reallocate income, gain, loss and deductions to produce such Target Final Balances).

## SECTION 5

## MANAGEMENT

**5.1    Management.**  The Company shall be managed by the Managing Member, which initially shall be WAI (who shall be treated as a manager under the Act).  Subject to the satisfaction of the requirements set forth in Paragraph 5.2:  (i) the Managing Member may resign as such at any time by giving written notice to each Member, and (ii) any Managing Member may be removed, with or without cause, by the vote of 75% in interest (by Percentage Interest) of the Members.  Election of a Managing Member to fill a vacancy shall be by the affirmative vote of 75% in interest of the Members.  Except as otherwise set forth herein, the overall management and control of the business and affairs of the Company shall be vested in the Managing Member and no Member shall have any voting rights, rights to require meetings or other rights of management, control or approval over the business and affairs of the Company.

**5.2    Specified Actions.**  Provided that no Event of Default by WKI exists under the Lease and the Lease is otherwise in full force and effect, the consent of both WKI and the Managing Member shall be required for any of the following actions to be taken by or with respect to the Company:

**(a)**    the assumption of any indebtedness, loans, leases or other dispositions other than (i) the Loan; (ii) unsecured trade debt which is not evidenced by a note, is incurred in the ordinary course of its business in connection with owning, operating and maintaining its interest in the Property, and which is paid within the thirty (30) days from the date incurred; and (iii) personal guarantees by Kevin A. Shields to: the Village of Monee in connection with the infrastructure improvements required for constructing the improvements required by the Lease; Lender in connection with the Loan; Tenant in connection with the Priority Return;

**(b)**    entering into any amendment to the Loan Documents or prepayment or defeasance in whole or in part of any amounts under the Loan Documents (unless the remaining Basic Monthly Rent under the Lease is simultaneously reduced by the amount of the then remaining Priority Return);

**(c)**    further encumbrance of the Property (other than encumbrances in connection with the Loan or any permitted refinancing thereof);

**(d)**    sale, transfer or other disposition of the Property;

**(e)**    amendment of this Agreement;

**(f)**    engaging in any business activity not described in Section 1.3 above;

**(g)**    transfer a Member's interest in the Company pursuant to Section 9 (other than estate planning transfers);

**(h)**    any other action which would materially and adversely affect WKI's right to receive the Priority Returns under this Agreement.

Notwithstanding anything to the contrary contained in this Agreement, in the event the Company requests that WKI, as tenant, amend the Lease to reduce the Basic Monthly Rent for each year of the Lease term by the amount of the Priority Returns for each corresponding year, WKI, as tenant, and Company, as landlord, shall so amend the Lease and thereafter WKI's rights to the Priority Returns shall forever be terminated and WKI's consent shall no longer be required for the matters specified in Subsections (a) through (g) above.

## SECTION 6

## INDEMNIFICATION OF MEMBERS

### 6.1    Indemnification.

(a)    **General.**  The Company or its receiver or its trustee (to the extent of the Property only) shall indemnify, save harmless, and pay all judgments, liabilities and claims against each Member and Managing Member or any officers, directors, members, Managing Member or partner of such Member or Managing Member relating to any liability or damage incurred by reason of any act performed or omitted to be performed by such Member, officer, director or partner in good faith that was reasonably believed by such indemnified Person to have been in the best interests of the Company and which pertained to the business of the Company, including attorneys' fees incurred by such Member, Managing Member, officer, director or partner in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law.

(b)    **Subordination of Indemnification Obligations.**    Notwithstanding Section 6.1(a), so long as any of the Loans remains outstanding, the Company's obligation to indemnify its Members, Managing Member and officers shall be subordinated to the repayment of the Loans and shall not constitute a claim against the Company in the event that cash flow in excess of amounts necessary to pay holders of the Loans is insufficient to pay such obligations.

### 6.2    Limitations.

(a)    Notwithstanding anything to the contrary in any of Section 6.1 no Member or Managing Member shall be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

(b)    Notwithstanding anything to the contrary in Section 6.1, in the event that any provision in such Section is determined to be invalid in whole or in part, such Section shall be enforced to the maximum extent permitted by law.

(c)    The indemnity obligations of the Company shall be satisfied solely out of Company assets.

(d)    No indemnification shall be available for any judgment, liability or claim to the extent covered by insurance for which insurance proceeds are actually available.

## SECTION 7

## ACCOUNTING, BOOKS AND RECORDS

**7.1    Accounting, Books and Records.**  The Managing Member on behalf of the Company shall maintain at the Company's office separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the Company business in accordance with the cash method of accounting and, to the extent inconsistent therewith, in accordance with this Agreement.  The Company shall use the cash method of accounting in preparation of its annual reports and for tax purposes and shall keep its books accordingly.  Each Member shall, at its sole expense, have the right, at any time without notice to any other Member, to examine, copy, and audit the Company's books and records during normal business hours.  Upon request, the Managing Member shall provide to WKI copies of all financial statements provided to any Lenders.

**7.2    Tax Returns; Information.**  The Managing Member shall cause the Company's accountants to prepare all income and other tax returns of the Company and shall cause the same to be filed in a timely manner.  Each Member agrees to cooperate in providing to the Managing Member financial records and information required by the Managing Member to prepare the Company's tax returns.  The Managing Member shall furnish to each Member a copy of each such return, together with any schedules or other information which each Member may require in connection with such Member's own tax affairs promptly after it is available.

**7.3    Tax Matters Member.**  WAI is specially authorized to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

## SECTION 8

## AMENDMENTS; MEETINGS

**8.1    Amendments.**  Subject to Section 1.3 and Section 5.2, this Agreement shall not be amended without the consent of Members holding at least seventy-five percent (75%) of the Percentage Interests.

**8.2    Meetings.**  Meetings of the Members to discuss Company matters may be held at such time, date and place as the Managing Member may fix from time to time (or may be held telephonically at the request of any Member), or upon five days notice by any Member.  A quorum shall be required for any meeting conducted pursuant to this Section 8.2, and provided WKI is not in default under the Lease, such quorum must include WKI.

## SECTION 9

## TRANSFERS OF INTERESTS

**9.1    Restrictions on Transfers.**  Except as expressly permitted or required by this Agreement, no Member shall Transfer all or any portion of its interest in the Company or any

rights therein without the consent of the Managing Member. Any Transfer or attempted Transfer by any Member in violation of the preceding sentence shall be null and void and of no force or effect whatever. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable. Each Member hereby further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement.

**9.2    Permitted Transfers.**

    **(a)    General.**  Subject to the conditions and restrictions set forth in this Section 9.2, a Member shall have the right to Transfer all or any portion of its interest in the Company by means of a Permitted Transfer.

    **(b)    Definition of Permitted Transfer; Permitted Transferees.**

        **(i)**  A "Permitted Transfer" is any Transfer by a Member of all or any portion of its interest in the Company to a Permitted Transferee, provided that such Transfer otherwise complies with the conditions and restrictions of this Section 9.2.

        **(ii)**  A "Permitted Transferee" of a Member is any Person who is (1) a Wholly Owned Affiliate of such Member, (2) any other Member, or (3) any Person approved as a Permitted Transferee by the Managing Member.

    **(c)    Conditions to Permitted Transfers.**  A Transfer otherwise permitted under this Section 9.2 shall not be a Permitted Transfer and any attempted Transfer of a Member's interest to a Permitted Transferee shall be null and void and of no force or effect whatever unless and until the following conditions are satisfied:

        **(i)**  The transferor and transferee shall execute such documents and instruments of conveyance and assumption as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the Permitted Transferee's agreement to be bound by the provisions of this Section 9 and assumption of all monetary obligations of the transferor Member with respect to the interest being transferred and the transferor Member's agreement to guarantee the prompt payment and performance of such assumed obligations.

        **(ii)**  A Member making a Permitted Transfer of all or a portion of its Company interest and the Permitted Transferee thereof shall pay all reasonable costs and expenses incurred by the Company in connection with such Transfer.

    **(d)    Admission of Permitted Transferee as a Member.**  A Permitted Transferee of an interest in the Company shall be admitted as a Member in the Company only upon the consent of the Managing Member which consent may be granted or withheld in such

Managing Member's sole discretion. The rights of a Permitted Transferee who is not admitted as a Member shall be limited to the right to receive allocations and distributions from the Company with respect to the interest transferred, as provided by this Agreement. The transferee of such interest shall not be a member with respect to such interest, and, without limiting the foregoing, shall not have the right to inspect the Company's books, act for or bind the Company, or otherwise interfere in its operations. Notwithstanding the foregoing, WKI shall have the right to transfer its interest in the Company to any Person to which WKI assigns its interest in the Lease without the Managing Member's consent provided that WKI has received the consent, if required, of the Company and the Lender to the assignment of the Lease pursuant to the terms contained therein.

(e)    **Effect of Permitted Transfer on Company.** The Members intend that the Permitted Transfer of an interest in the Company shall not cause the dissolution of the Company under the Act; however, notwithstanding any such dissolution, the Members shall continue to hold the Company's assets and operate its business in Company form under this Agreement as if no such dissolution had occurred.

## SECTION 10

## WITHDRAWALS; ACTION FOR PARTITION; BREACHES

**10.1    Waiver of Partition.** No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or cause the sale of any Company property and notwithstanding any provisions of applicable law to the contrary, each Member (and each of its legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to its Company interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

**10.2    Covenant Not to Withdraw or Dissolve.** Notwithstanding any provision of the Act, each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) take any action to commence dissolution or its equivalent or cause a greater than 50% change of ownership with respect to itself, (b) take any action that would constitute a Bankruptcy Action with respect to such Member, (c) exercise any power under the Act to dissolve the Company, (d) transfer all or any portion of its interest in the Company except a Permitted Transfer, (e) petition for judicial dissolution of the Company, or (f) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits) without, in each case, the consent of the Managing Member.

**10.3    Consequences of Violation of Covenants.** Notwithstanding anything to the contrary in the Act, if a Member (a "Breaching Member") attempts to (i) cause a partition in breach of Section 10.1 hereof or (ii) withdraw from the Company or dissolve the Company or

take any action in breach of Section 10.2 hereof, the Company shall continue and such Breaching Member shall be subject to this Section 10.3. In such event, the following shall occur;

    **(a)**    The Breaching Member shall immediately cease to be a Member and shall have no further power to act for or bind the Company;

    **(b)**    The other Member shall continue to have the right to possess the Company's property and goodwill and to conduct its business and affairs;

    **(c)**    The Breaching Member shall be liable in damages, without requirement of a prior accounting, to the Company for all costs and liabilities that the Company or any Member may incur as a result of such breach;

    **(d)**    The Company shall have no obligation to pay to the Breaching Member its contributions, capital, or profits, but may, by notice to the Breaching Member within thirty (30) days of its withdrawal, elect to make Breach Payments (as hereinafter defined) to the Breaching Member in complete satisfaction of the Breaching Member's interest in the Company;

    **(e)**    If the Company does not elect to make Breach Payments pursuant to Section 10.3(d) hereof, the Company shall treat the Breaching Member as if he were an unadmitted assignee of the interest of the Breaching Member and shall make distributions to the Breaching Member only of those amounts otherwise payable with respect to such interest hereunder;

    **(f)**    The Company may apply any distributions otherwise payable with respect to such interest (including Breach Payments) to satisfy any claims it may have against the Breaching Member;

    **(g)**    The Breaching Member shall have no right to inspect the Company's books or records or obtain other information concerning the Company's operations; and

    **(h)**    The Breaching Member shall continue to be liable to the Company for any unpaid Capital Contributions required hereunder with respect to such interest and to be jointly and severally liable with the other Members for any debts and liabilities (whether actual or contingent, known or unknown) of the Company existing on the date the Member becomes a Breaching Member.

    **10.4**    **Breach Payments.**  For purposes hereof, Breach Payments shall be made in five installments, each equal to one-fifth of the Breach Amount, payable on the next five (5) consecutive anniversaries of the breach by the Breaching Member, with simple interest accrued from the date of such breach through the date each such installment is paid on the unpaid balance of such Breach Amount at the applicable federal rate per annum. The Breach Amount shall be an amount equal to the Net Equity of the Breaching Member's interest on the day of such breach, computed in accordance with Section 10.6 hereof. The Company may, at its sole election, prepay all or any portion of the Breach Payments or interest accrued thereon at any time without penalty.

**10.5    No Bonding.** Notwithstanding anything to the contrary in the Act, the Company shall not be obligated to secure the value of the Breaching Member's interest by bond or otherwise; provided, however, that if a court of competent jurisdiction determines that, in order to continue the business of the Company such value must be so secured, the Company may provide such security. If the Company provides such security, the Breaching Member shall not have any right to participate in Company profits or distributions during the term of the Company, or to receive any interest on the value of such interest. For this purpose, the value of the interest of the Breaching Member shall be the Net Equity of such interest as of the effective date of the Breaching Member's withdrawal.

**10.6    Net Equity.** The "Net Equity" of a Member's interest in the Company (other than WKI's), as of any day, shall be the amount that would be distributed to such Member in liquidation of the Company pursuant to Section 12 hereof if (1) all of the Company's assets were sold for their Gross Appraised Values, (2) the Company paid its accrued, but unpaid, liabilities and established reserves for the payment of reasonably anticipated contingent or unknown liabilities, and (3) the Company distributed the remaining proceeds to the Members in liquidation, all as of such day. WKI's Net Equity shall be the undistributed amount of any rental income payable to WKI under Section 3.4 through the date of the event causing WKI to become a Breaching Member.

The Net Equity of a Member's interest in the Company shall be determined, without audit or certification, from the books and records of the Company by the firm of independent certified public accountants regularly employed by the Company. The Net Equity of a Member's interest shall be determined within thirty (30) days of the day upon which such accountants are apprised in writing of the Gross Appraised Value of the Property, and the amount of such Net Equity shall be disclosed to the Company and each of the Members by written notice. The Net Equity determination of such accountants shall be final and binding in the absence of a showing of gross negligence or willful misconduct.

"Gross Appraised Value," as of any day, shall be equal to the fair market value of the Property as of such day. As used herein, as of any day, the "fair market value" of the Property means the amount that a single buyer would reasonably be expected to pay for the Property owned by the Company on such day, free and clear of all liens and encumbrances, in a single cash purchase, taking into account the current condition, use, and zoning of the Property.

In situations under this Agreement in which it is necessary to determine Gross Appraised Value, each Member shall within ten (10) days after request of a Member appoint an appraiser (the "First Appraiser" and the "Second Appraiser"). If the Second Appraiser is timely designated, the First and Second Appraisers shall meet within ten (10) days of such appointment and shall endeavor, within twenty (20) days of such appointment, to agree upon, and give written notice to the Company, the Members, and the firm of independent certified public accountants regularly employed by the Company, of the Gross Appraised Value of the Property (the "Appraisers' Notice"). If an Appraisers' Notice is not given during such period, then at any time after such period, either the Member who appointed the First Appraiser or the Member who appointed the Second Appraiser, by written notice to the First Appraiser and Second Appraiser, may demand that they appoint a Third Appraiser (the "Third Appraiser"). If the First Appraiser and Second Appraiser have not either given an Appraisers' Notice or appointed the Third

Appraiser (who shall have agreed to serve) by the twentieth day after such demand, either the Member who appointed the First Appraiser or the Member who appointed the Second Appraiser may request any judge of the Superior Court of the County of Los Angeles to appoint the Third Appraiser. After the appointment of the Third Appraiser, the Gross Appraised Value shall be the amount included in an Appraisers' Notice subscribed to by at least two (2) of the three (3) appraisers; provided that before subscribing to a Gross Appraised Value, the Third Appraiser shall meet at least once with the First Appraiser and the Second Appraiser to discuss in good faith the appraisal of the Property. If two (2) of the appraisers have not given an Appraisers' Notice within twenty (20) days of the appointment of the Third Appraiser, the Gross Appraised Value of the Project shall be determined solely by the Third Appraiser, who shall give an Appraisers' Notice within thirty (30) days of his appointment.

If a Second Appraiser is not timely appointed in the manner provided by this Agreement, the Gross Appraised Value shall be determined solely by the First Appraiser who shall give an Appraisers' Notice of such Gross Appraised Value within ten (10) days of the last day on which the Second Appraiser could have been timely designated.

Each appraiser appointed hereunder shall be disinterested and shall be a member of the Appraisal Institute or other appropriate body and qualified to appraise real property similar to the Property and located in the vicinity of the Property.

## SECTION 11

### BUY-SELL

**11.1    Buy-Sell.**  The Members (other than WKI) shall have the rights of purchase and sale provided by this Section 11.1, to be exercised by delivering a notice (an "Election Notice"). A Member giving an Election Notice as provided herein is referred to as an "Electing Member," a Member receiving an Election Notice is referred to as a "Notice Member."  For purposes of this Section 11, WAI and Shields shall be treated as one Member.  WKI's interest in the Company shall not be subject to the Buy-Sell provisions of this Section 11.1.

**(a)    Impasse.**  An "Impasse" is a deadlock among the Members on a material issue or the failure of any of the Members to give its consent or approval relative to any matter requiring such consent or approval.  An Impasse shall occur on the sixth Business Day after any consent or approval is requested by a Member pursuant to any provision of this Agreement if any other Member has failed to give such consent or approval.

**(b)    Invocation of Buy-Sell Procedure.**  In the event of an Impasse, for a period ending at 11:59 P.M. (local time at the Company's principal place of business) on the thirtieth day following the occurrence of the Impasse (the "Election Day"), this buy-sell procedure may be invoked by the giving of an Election Notice by any Member.  Such Election Notice, to be valid, shall state an amount (the "Stated Amount") to be used as the value of the Property in computing the Net Stated Equity (as defined in Section 11.2 below) of the Members' interests, and shall be given to the Notice Member.  The Stated Amount shall be a reasonable approximation of the fair market value of the Property.

(c)    **Effect of Election Notice; Buy-Sell Price.**  An Election Notice shall constitute an irrevocable offer by the Electing Member either to (1) purchase all, but not less than all, of the interest in the Company of the Notice Member, or (2) sell all, but not less than all, of its interest in the Company to the Notice Member.  The price at which the interest of any Member is purchased and sold under this Section 11.1 (the "Buy-Sell Price" of such interest) is the Net Stated Equity thereof, determined as of the Election Day.  The cost of determining Net Stated Equity shall be borne by the Company and shall be treated as an expense for purposes of such determination.

(d)    **Notice Member's Election to Purchase or Sell.**  For a period (the "Election Period") ending at 11:59 P.M. (local time at the Company's principal place of business) on the tenth day following the Election Day, the Notice Member shall have the right to elect to purchase all, but not less than all, of the interest in the Company of the Electing Member, by giving notice thereof (the "Purchase Notice") to the Electing Member.  In such event, the Notice Member shall become the "Purchasing Member" and shall be obligated to purchase all of the Electing Member's interest.  In any other case, the Electing Member shall become the Purchasing Member and shall be obligated to purchase all of the interest of the Notice Member, who shall become the Selling Member and shall be obligated to sell all of its interest to the Purchasing Member.

(e)    **Terms of Purchase; Closing.**  The closing of the purchase and sale of the Selling Member's interest shall occur on a date and time mutually agreeable to the Purchasing Member and the Selling Member, which shall not be later than 10:00 A.M. (local time at the place of the closing) on the first Business Day occurring on or after the ninetieth day following the last day of the Election Period and at such place as is mutually agreeable to the Purchasing Member and Selling Member, or upon the failure to agree, at the Company's principal place of business.  At the closing the Purchasing Member shall pay to the Selling Member, by cash or other immediately available funds, the portion of the Buy-Sell Price of such Selling Member's interest, and the Selling Member shall deliver to the Purchasing Member good title, free and clear of any liens, claims, encumbrances, security interests or options (other than those granted by this Agreement) to the Selling Member's interest thus purchased.

At the closing the Members shall execute such documents and instruments of conveyance as may be necessary or appropriate to confirm the transactions contemplated hereby, including, without limitation, the Transfer of the Company interest of the Selling Member to the Purchasing Member and the assumption by the Purchasing Member of the Selling Member's obligation with respect to the Selling Member's interest transferred to the Purchasing Member.  The reasonable costs of such Transfer and closing, including, without limitation, attorneys' fees and filing fees, shall be divided equally between the Selling Member and the Purchasing Member.

**11.2    Net Stated Equity.**  The "Net Stated Equity" of a Member's interest in the Company, as of any day, shall be the amount that would be distributed to such Member in liquidation of the Company pursuant to Section 12 hereof if (1) all of the Company's assets were sold for the Stated Amount, (2) the Company paid its accrued, but unpaid, liabilities and established reserves pursuant to Section 12.2 hereof for the payment of reasonably anticipated

contingent or unknown liabilities, and (3) the Company distributed the remaining proceeds to the Members in liquidation, all as of such day.

The Net Stated Equity of a Member's interest in the Company shall be determined, without audit or certification, from the books and records of the Company by the firm of independent certified public accountants regularly employed by the Company. The Net Stated Equity of a Member's interest shall be determined within thirty (30) days of the day upon which such accountants are apprised in writing of the Stated Amount, and the amount of such Net Stated Equity shall be disclosed to the Company and each of the Members by written notice. The Net Stated Equity determination of such accountants shall be final and binding in the absence of a showing of gross negligence or willful misconduct.

**11.3    WKI Buyout.**  Upon (1) a termination of the Lease, (2) occurrence of all events necessary to entitle the Company to terminate the Lease pursuant to Article XVII thereof (whether or not the Company elects to so terminate) or (3) an amendment to the Lease pursuant to Section 5.2, the Company shall have the right to purchase all WKI's interest in the Company by paying to WKI the amount of any unpaid payments due WKI under Section 3.4 through the date of such termination or occurrence of such events, and WKI shall thereafter have no interest in the Company. In the event the Company purchases WKI's interest in the Company because of a termination of the Lease, and the Company sues WKI pursuant to Article XVII of the Lease for the rent that would have been payable had the Lease not been terminated, the amount of such rent shall be reduced by the amount of any Priority Returns applicable to the period for which such rent is collected.

**11.4    WKI Cure Rights.**  In the event the Lender notifies the Company or WKI that a default under the Loan has occurred, WKI shall have the right, but not the obligation, to cure such default, provided that WKI shall first notify the Managing Member of its intent to cure the default and allow the Managing Member a period of time to cure the default equal to the lesser of (a) five (5) business days or (b) one business day less than the period for such default to be cured under the Loan. If the Managing Member commences within such five (5) business day period to cause the default to be cured and thereafter diligently pursues such cure in accordance with the Company's cure rights under the Loan, WKI shall not have the right independently to cure the default. If the Managing Member does not cure or commence to cure such default during such five (5) business day period, WKI may elect to cure such default, in which case, WKI shall be entitled to reimbursement by the Company for all sums paid by WKI and all costs and expenses incurred by WKI in curing such default. All sums so paid by WKI and all reasonable costs and expenses (including, without limitation, attorneys' fees and expenses) so incurred, together with interest thereon (to the extent permitted by law) at the Overdue Rate, as such term is defined in the Lease (or at the maximum rate permitted by law, whichever is the lesser) from the date on which such sums or expenses are paid or incurred by WKI, shall be paid by the Company to WKI on demand.

## SECTION 12

## DISSOLUTION AND WINDING UP

**12.1    Liquidating Events.** The Company shall dissolve and commence winding up and liquidating only upon the occurrence of any of the following ("Liquidating Events"):

(a)    The Managing Member files a petition, or has an involuntary petition filed against it, under the Bankruptcy Code, as it may be amended from time to time, without such proceeding being vacated or dismissed within one hundred twenty (120) days after commencement thereof unless the business of the Company, including, without limitation, the operation of the Property, is continued by the consent of the Members holding a majority of the remaining Percentage Interests within ninety (90) days after the occurrence of such event. If such consent is not timely obtained, the Company shall not liquidate any collateral pledged in support of the Loans unless the consent of the applicable rating agencies in regard to any rated securities issued in relation to the Loans and the holders of the Loans has been obtained (collectively the "Lenders"), and that such Lenders may continue to exercise all of their rights under the loan documents and retain any collateral until the Loan has been paid in full or otherwise completely discharged.; and

(b)    By the vote or written consent of all Members, or if no Loan is then outstanding and provided the Company has fulfilled all of its obligations to WKI under the provisions of Sections 3.4 and 4.5 hereof, by the Managing Member.

**12.2    Winding Up.** Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the property of the Company has been distributed pursuant to this Section 12.2 and the Company has terminated. The Managing Member shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the Company's liabilities and assets, shall cause the assets to be liquidated as promptly as is consistent with obtaining the fair market value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

(a)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members;

(b)    Second, to the payment and discharge of all of the Company's debts and liabilities to Members (including payment of any Priority Returns due to WKI); and

(c)    The balance, if any, to the Members in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

The Managing Member shall not receive any additional compensation for any services performed pursuant to this Section 12. Each Member understands and agrees that by accepting the provisions of this Section 12.2 setting forth the priority of the distribution of the assets of the Company to be made upon its liquidation, such Member expressly waives any right which it, as a creditor of the Company, might otherwise have under the Act to receive distributions of assets *pari passu* with the other creditors of the Company in connection with a distribution of assets of the Company in satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

     **12.3   Rights of Members.** Except as otherwise provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Company and (b) no Member shall have priority over any other Member as to the return of its Capital Contributions, distributions, or allocations.

**SECTION 13**

**MISCELLANEOUS**

     **13.1   Notices.** Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by overnight courier, or by telephone or facsimile, if such telephone conversation or facsimile is followed concurrently by a hard copy of the telephone conversation or facsimile communication sent by first-class U.S. mail, postage prepaid, addressed as follows or to such other address as such Person may from time to time specify by notice to the Members: if to the Company, to the Company at the address set forth in Section 1.4 hereof; and if to a Member, to such Member at the address set forth on Exhibit A hereto. Any such notice shall be deemed to be delivered, given, and received as of the date so delivered.

     **13.2   Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

     **13.3   Construction.** Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. The terms of this Agreement are intended to embody the economic relationship among the Members and shall not be subject to modification by, or be conformed with, any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

     **13.4   Time.** Time is of the essence with respect to each provision of this Agreement.

     **13.5   Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**13.6    Severability.**  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**13.7    Further Action.**  Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement; and, in that connection, the Managing Member agrees to execute and deliver whatever documents may be required by the other in carrying out its respective functions under Sections 5.2 and 5.3.

**13.8    Variation of Pronouns.**  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

**13.9    Governing Law.**  The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

**13.10    Counterpart Execution.**  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

**13.11    Entire Agreement.**  This document contains all of the understandings and agreements among the Members with respect to the rights, obligations, interests and liabilities of the Members pertaining to the Company and supersedes all prior agreements, discussions and understandings concerning such subject matter.

**13.12    Attorneys Fees.**  In any action or proceeding between or among the Members arising out of this Agreement, the unsuccessful Member shall pay to the prevailing Member all costs and expenses, including, without limitation, reasonable attorneys fees incurred by the prevailing Member in such action or proceeding whether or not such action or proceeding is prosecuted to judgment.

**IN WITNESS WHEREOF,** the parties have entered into this Agreement as of the day first above set forth.

Managing Member:

**WILL ACQUISITIONS, INC.,**
a Delaware corporation

By: _____
　　Kevin A. Shields,
Its: _____

Members:

_____
　　Kevin A. Shields

_____
　　Don Pescara

_____
　~~Will W. O'Leary~~

**WORLD KITCHEN, INC.**

By_____
Name:_____
Title:_____

**IN WITNESS WHEREOF,** the parties have entered into this Agreement as of the day first above set forth.

Managing Member:

**WILL ACQUISITIONS, INC.,**
 a Delaware corporation

By:_____
         Kevin A. Shields,
Its:_____

Members:

_____
         Kevin A. Shields

_____
         Don Pescara

_____
         ~~Will W. O'Leary~~

**WORLD KITCHEN, INC.**

By_____
Name:\_\_\_\_Raymond J. Kulla\_\_\_\_
Title:\_\_Vice President & Secretary\_\_

**EXHIBIT A**

| Names and Addresses of Members | Percentage Interests | Capital Contributions |
|---|---|---|
| Will Acquisitions, Inc.<br>c/o Kevin Shields<br>3421 Manhattan Avenue<br>Manhattan Beach, CA 90266-3359 | 1% | $100.00 |
| Kevin A. Shields<br>3421 Manhattan Avenue<br>Manhattan Beach, CA 90266-3359 | 74% | $100.00 |
| Don Pescara<br>4 Charleston Road<br>Hinsdale, Illinois 60521 | 25% | $100.00 |
| World Kitchen, Inc. | 0% | $   0.00 |

# EXHIBIT B

## Description of the Property

**EXHIBIT B**
**LEGAL DESCRIPTION OF REAL PROPERTY**

THE EAST 750.00 FEET OF THE SOUTH 2010.00 FEET OF THAT PART OF THE
SOUTHEAST QUARTER OF SECTION 20, IN TOWNSHIP 34 NORTH IN RANGE 13 EAST
OF THE THIRD PRINCIPAL MERIDIAN, LYING WEST OF THE WEST LINE OF
HELLMAN'S SUBDIVISION AS ORIGINALLY PLATTED, ACCORDING TO THE PLAT
THEREOF RECORDED SEPTEMBER 19, 1899, AS DOCUMENT NO. 204312, IN MAP
BOOK 11, PAGES 27 AND 28 (EXCEPTING THEREFROM THAT PART OF THE
SOUTHEAST QUARTER OF SAID SECTION 20 LYING EAST OF THE WEST LINE OF
SAID LOT 3 PROJECTED SOUTH, SOUTH OF THE SOUTH LINE OF SAID LOT 3, WEST
OF THE WEST LINE OF LOT 4 IN SAID HELLMAN'S SUBDIVISION AND NORTH OF
THE NORTH LINE OF LOT 5 IN SAID HELLMAN'S SUBDIVISION; AND ALSO
EXCEPTING A STRIP OF LAND DESCRIBED AS FOLLOWS:  BEGINNING AT THE
NORTHWEST CORNER OF SAID LOT 3; THENCE SOUTH ALONG THE WEST LINE OF
SAID LOT 3 AND SAID LINE PROJECTED SOUTH A DISTANCE OF 614.35 FEET;
THENCE WEST ALONG A LINE AT RIGHT ANGLES TO THE LAST NAMED LINE A
DISTANCE OF 20.0 FEET; THENCE NORTH ALONG A LINE 20 FEET WEST OF AND
PARALLEL TO THE WEST LINE OF SAID LOT 3 AND SAID LINE PROJECTED SOUTH
A DISTANCE OF 594.36 FEET TO A POINT OF CURVE; THENCE NORTHERLY AND
EASTERLY ALONG A CURVE CONVEX TO THE NORTHWEST AND HAVING A
RADIUS OF 20.0 FEET TO THE POINT OF BEGINNING), ALL IN WILL COUNTY,
ILLINOIS.

# EXHIBIT 4

11-05-02  11:13am  From-GP.FF14 CAPITAL                3105467550              T-214  P 01/05  F-933

# AGREEMENT

This Agreement is made as of the _2ND_ day of _November_, 2000 between Kevin A. Shields ("Shields"), Don Pescara ("Pescara") and Bret Broaddus ("Broaddus").

## RECITALS

A    Reference is made to the First Amended and Restated Operating Agreement of WII I PARTNERS, LLC, a Delaware limited liability company (the "Company"), dated as of April 26, 2000 (the "Operating Agreement"), between Shields, Pescara, World Kitchen, Inc., a Delaware corporation ("WKI"), and Will Acquisitions, Inc., a Delaware corporation ("Managing Member"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Operating Agreement.

B.    Shields currently owns a 74% Membership Interest in the Company. Simultaneously with the execution and delivery of this Agreement, Shields is assigning to Broaddus a 7.50% Percentage Interest in the Company. Subsequent to such assignment Shields will own a 66.5% Percentage Interest ("Shields Interest"). Pescara currently owns a 25% Percentage Interest in the Company. Simultaneously with the execution and delivery of the letter, Pescara is assigning to Broaddus a 2.5% Percentage Interest in the Company. Subsequent to such assignment Pescara will own a 22.50% Membership Interest (the "Pescara Interest"). Subsequent to the assignments by Shields and Pescara, Broaddus will own a ten percent (10%) Membership Interest in the Company.

C.    Shields and Pescara have agreed to compensate Broaddus for certain future services by paying to Broaddus 44.444% of ninety percent (90%) of the Net Cash Flow, Net Proceeds, or in kind distributions, if any, actually received by Shields and Pescara from the Shields Interest and the Pescara Interest, respectively ("Distributions"). Such 44.444% payment of the Distributions is hereinafter referred to as the "Additional Payments".

D.    Broaddus hereby acknowledges that by virtue of the foregoing assignments from Shields and Pescara, and the Additional Payments, he is effectively receiving 50.00% of 100% of the Distributions to all Members of the Company.

NOW THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    The Recitals to this Agreement are hereby incorporated by reference as though ully set forth herein.

2.    Notwithstanding anything contained in the Operating Agreement to the contrary:

(i)    within five (5) business days after receipt thereof, after receipt of any Distributions, Shields and Pescara shall pay to Broaddus an amount equal to 44.444% of the Distributions received by them pursuant to the Shields Interest and the Pescara Interest, respectively;

Doc No · 324542v7

(ii)    Broaddus agrees that for tax purposes, he shall receive all General Tax Allocations, Special Tax Allocations and all other tax effects arising from the payments referred to in clause (i) above as if Broaddus owned a 50% Membership Interest in the Company, notwithstanding that Broaddus is entitled only to an interest in the Distributions actually received by Shields and Pescara;

(iii)    if the parties are unable to effect such tax treatment through direct payments to Broaddus, the parties shall form an entity into which such Distributions shall be placed to effectively allocate the tax effects of such payments to accomplish the objective set forth in clause (ii) above, without requiring Shields or Pescara to pay tax on, or suffer negative tax consequences as a result of, the Additional Payments;

(iv)    Shields shall be the Tax Matters Member or Partner of such entity for purposes of effecting the stated objectives set forth in clause (iii) above and the costs of such entity formation and operation (e.g., attorneys' and accountants' fees, formation, maintenance, franchise fees and the like) shall be divided between the parties on the basis of the Distributions retained by them, after giving effect to this Agreement and the Additional Payments;

(v)    if any party fails to comply with the provisions of clause (iii) and (iv) above, such non-complying party, at its sole cost and expense, shall indemnify, defend and hold harmless the other parties hereto with respect to any adverse tax treatment, consequences or effects arising from such failure. Costs and expense incurred by the complying parties hereto may be offset from Distributions payable to the non-complying party.

3.    Broaddus acknowledges and agrees that (a) the Shields Assignment and the Pescara Assignment are contingent upon the consent of WKI and Wells Fargo Bank National Association ("Wells"), holder of the current Loan on the Property; (b) if the consent of the foregoing parties is not received, this Agreement and the assignments described in clause (a) above shall be void, *ab initio*, and of no force and effect provided, however, that Shields and Pescara shall act diligently in obtaining the consents of WKI and Wells; and (c) costs or expenses in obtaining such consents including, without limitation, attorneys' fees of the Company and Wells, shall be deemed an expense of the Company.

4.    Broaddus further acknowledges and agrees that the liability for any one or more of the Additional Payments is not a joint and several obligation of Shields or Pescara; and that this Agreement is not a guarantee that any specific amount or return will be distributed to Shields or Pescara and paid to Broaddus as Additional Payments.

5.    In the event of either (a) a financing of the Property (b) a sale of the Property; or (c) the leasing of the Property, Shields, as managing member of the Manager of the Company, shall cause the Manager to deliver sixty (60) days prior notice to Broaddus.

6.    Notwithstanding anything contained in the Operating Agreement to the contrary, in the event of an exercise of the Buy/Sell right pursuant to the terms of Section 11 of the Operating Agreement by the parties hereto, the Buy Sell Price of the respective interests of the Members shall be adjusted as hereinafter set forth:

Doc No.: 524542v7

(a) If Broaddus elects to purchase the Shields Interest or the Pescara Interest, the Buy Sell Price for the interest in question shall be adjusted by multiplying the same by 55.556%.

(b) If Shields or Pescara elect to purchase the Broaddus Membership Interest, the Buy Sell Price shall be adjusted by multiplying the same by 500%.

(c)   the parties acknowledge that the aforesaid percentages (i) have been calculated based on the percentage of each parties membership interests as of the date hereof, and that such percentages shall be equitably adjusted in the event the percentage amount of their respective interests changes; and (ii) the interests of the Managing Member and Kevin Shields have been treated as one interest for the purpose of this paragraph.

7.   Should it be necessary for any party to this Agreement to initiate legal proceedings to adjudicate any issues arising hereunder or under any document executed pursuant hereto, the prevailing party in such legal proceedings shall be entitled to reimbursement of such party's attorneys' fees, costs, expenses and disbursements (including the fees and expenses of expert witnesses) reasonably incurred or made in bringing such proceeding.  This Agreement constitutes the entire agreement between the parties hereto pertaining to Broaddus' interest in the Company and all prior and contemporaneous agreements, representations, negotiations and understandings of the parties hereto, oral or written, are hereby superseded with respect to the subject matter hereof.  No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is or may be sought.

8.   If it is necessary to interpret or enforce any of the terms of this Agreement, it is the intent of all parties that the laws of the State of Delaware shall apply, without giving effect to principles or provisions thereof related to conflicts of laws or choice of laws.

9.   No waiver by either party of a breach of any of the terms, covenants or conditions of this Agreement by the other party shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition herein contained.  No waiver of any default by either party hereunder shall be implied from any omission by the other party to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect a default other than as specified in such waiver.  The consent or approval by either party to any act by the other party requiring consent or approval, shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent similar acts.

10.   This agreement shall inure to the benefit of and be binding upon, the successors and assigns of each party hereto.

11.   All notices, demands, requests, consents, approvals and other communications hereunder shall be in writing and personally delivered or couriered (by Federal Express or another reputable, national overnight delivery service), addressed to the respective parties, as follows: if to Broaddus: 112 Clubhouse Drive, Barrington, IL 60010; with a copy to: Alan S. Levin, Esq., Alan S. Levin & Associates, Ltd., 134 North LaSalle Street, Suite 720, Chicago, Illinois 60602; if to Shields, c/o Griffin Capital, 3421 Manhattan Avenue, Manhattan Beach, California, 90266; or if to Pescara, c/o Griffin Capital, 1214 N. LaSalle St., Chicago, IL 60610,

11-05-02  11:41am - From-GRIFFIN CAPITAL                3105467550            T-214  P.04/05  F-933

and in the case of notices to Shields or Pescara with a copy to: Mary Higgins, Esq., Wildman, Harrold, Allen & Dixon, 225 W. Wacker Drive, Chicago, IL 60606-1229, or to such other address as either may hereafter designate, and shall be effective upon receipt as evidenced by a receipt signed by a person at such address authorized to accept delivery, or upon refusal to accept delivery.

[SIGNATURE PAGE FOLLOWS]

:1-C3-02  1¦:42am  From-GRIFFIN CAPITAL          3105467550          T-214  P.05/05  F-933

.....IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth below.

Dated: As of _November    2    ,2000.

_____
Kevin A. Shields

_____
Don G. Pescara

_____
Bret A. Broaddus

Doc. No  534542v7